**KAISER ALUMINUM & CHEMICAL SALES, INC., Plaintiff-Appellee,**

v.

**AVONDALE SHIPYARDS, INC., Defendant-Appellant.**

Nos. 81–3162, 81–3519.

United States Court of Appeals, Fifth Circuit.

June 7, 1982.

Rehearing and Rehearing En Banc Denied July 26, 1982.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, James K. Irvin, Guy C. Lyman, Jr., New Orleans, La., Schnader, Harrison, Segal & Lewis, Kimber E. Vought, Philadelphia, Pa., for defendant-appellant in both cases.

Carl A. Solano, Philadelphia, Pa., for defendant-appellant in No. 81–3519.

Lemile, Kelleher, Kohlmeyer & Matthews, Ernest L. Edwards, New Orleans, La., for plaintiff-appellee in both cases.

Joseph N. Mole, New Orleans, La., for plaintiff-appellee in No. 81–3162.

Before WISDOM, POLITZ and TATE, Circuit Judges.

TATE, Circuit Judge:

Kaiser Aluminum and Chemical Sales, Inc. ("Kaiser") initiated this action in 1979 for simple breach of contract against Avondale Shipyards, Inc. ("Avondale"). In its answer to Kaiser's complaint, Avondale defended on the grounds that the contract sought to be enforced by Kaiser was violative of the antitrust laws. Avondale also filed a counterclaim seeking, *inter alia*, damages and equitable relief for the antitrust injury.

The district court dismissed the antitrust counterclaim and struck the antitrust defense. The court also entered partial final judgment with respect to the antitrust counterclaim, Fed.R.Civ.P. 54(b), and later certified its striking of the antitrust defense as a matter appropriate for interlocutory review, 28 U.S.C. § 1292(b). We granted Avondale's petition for review of the order striking the antitrust defense, and consolidated appeal on that issue with Avondale's appeal of the dismissal of the counterclaim.

On appeal, Avondale argues that: (1) the district court erred in dismissing Avondale's antitrust counterclaims on the basis of prescription or laches; and (2) the district court erred in striking Avondale's antitrust defense. Finding no error, we affirm.

I. *Facts and Issues*

This case involves a dismissal of Avondale's counterclaim under Fed.R.Civ.P. 12(b)(6)[1] and the striking of its defense under Fed.R.Civ.P. 12(f).[2] For purposes of appeal we construe as true the factual allegations in Avondale's complaint.

Avondale entered into negotiations with El Paso Natural Gas Company ("El Paso") for the construction and fitting of three liquid natural gas vessels. Although Avondale was experienced in the construction of the basic portions of these vessels, it was not experienced in the design or construction of the cryogenic (*i.e.*, for very low-temperature(s)) cargo containment system in which the liquefied gas is actually stored. It was necessary, therefore, for Avondale to subcontract design and construction of the containment system portion of the vessels.

El Paso chose a containment system whereby the gas is held in aluminum tanks that sit in the center of the vessel's cargo holds. The holds are insulated with a polyurethane spray that protects the hull from the cryogenic temperature of the gas, and provides a barrier against the escape of any gas. The only cargo containment system of the type that has received the necessary regulatory approval utilizes a polyurethane spray insulation made by Kaiser. Avondale alleges that Kaiser refused to supply or install insulation spray unless Avondale agreed to have Kaiser supply the aluminum tanks as well, and that Kaiser refused to submit separate bids for the aluminum tanks and the spray so that Avondale could compare Kaiser's tank prices with those of other manufacturers who desired to supply Avondale with the tank portion of the containment system.

Avondale agreed to purchase the spray and tanks from Kaiser, and on May 25, 1973, entered into a written subcontract that required Kaiser to supply fifteen aluminum tanks, and the required insulation, for a total consideration of $70,955,000. The subcontract provided for progress pay-

---

1. Fed.R.Civ.P. 12(b)(6) provides:

   *(b) How Presented.* Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted.

2. Fed.R.Civ.P. 12(f) provides:

   *(f) Motion to Strike.* Upon motion made by a party before responding to a pleading, or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon him or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

ments by Avondale, and contained a provision for the adjustment of the contract price as changes were made in the scope of the work. According to Avondale, Kaiser insisted on including provisions in the subcontract that would limit its liability for damages to Avondale, and would permit Kaiser to disclaim any responsibility for the design of the containment system that El Paso required Avondale to use.

Avondale claims that Kaiser's performance of its obligations under the subcontract proved to be highly unsatisfactory. Avondale alleges extensive delays, defects, and deficiencies with respect to Kaiser's construction of the aluminum tanks and application of the insulation spray that forced Avondale to undertake corrective measures at its own expense.

In July 1979, Kaiser filed suit under the subcontract, seeking to recover a balance it claimed to be due under the contract change provisions, and also seeking additional compensation related to what it alleges was Avondale's breach of certain contract provisions.

At about the time Kaiser instituted its suit against Avondale, Avondale claimed that it discovered numerous deep and massive cracks in the Kaiser insulation in each of the cargo holds in one of the vessels. Avondale also claims that the utility of the entire cargo containment system aboard one of the vessels was completely destroyed, and that it expects that the defect will be repeated on the other two vessels because of the defective nature of the insulation spray.

Avondale filed a counterclaim against Kaiser seeking, *inter alia*, damages for delays, deficiencies, and performance under the contract, and redress for the harm suffered as a result of the defects in the Kaiser insulation spray. Avondale also alleged that the subcontract violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 [3] and § 3 of the Clayton Act, 15 U.S.C. § 14.[4]

The thrust of Avondale's antitrust argument is that the subcontract between it and Kaiser contained an illegal "tying" arrangement in that Kaiser allegedly conditioned its sale of the desired insulation spray (the "tying" product) to Avondale's purchase from Kaiser of the undesired aluminum tank portion (the "tied" product) of the containment system.[5]

---

3. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.  .

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment

not exceeding three years, or by both said punishments, in the discretion of the court.

4. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

5. A tying arrangement involves "an agreement by a party to sell one product but only on the

In addition to seeking treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15,[6] Avondale sought permanently to enjoin Kaiser from enforcing any provisions of the subcontract, including those clauses that purport to limit Kaiser's liability to Avondale for damages and permit Kaiser to disclaim responsibility for the design of the cargo containment system. Avondale also asserted the unlawfulness of the subcontract as an affirmative defense.

Kaiser filed a motion to strike the defense under Federal Rule of Civil Procedure 12(f) and to dismiss the antitrust counterclaim under rule 12(b)(6) (as barred by the statute of limitations). Those motions were granted on January 5, 1981, by the district court. Avondale then moved for amendment of the district court's order to certify that the striking of the defense involved issues appropriate for interlocutory review under 28 U.S.C. § 1292(b),[7] and for entry of partial final judgment with respect to the antitrust counterclaim dismissal pursuant to Federal Rule of Civil Procedure 54(b).[8] The district court entered partial final judgment and Avondale filed a notice of appeal with respect to that judgment. The district court later amended its January 5 order to certify that its dismissal of the antitrust defense was a matter appropriate for interlocutory review. Avondale filed a petition for permission to appeal to this court, and we granted that permission on September 2,

condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Tying arrangements are subject to attack under both the Sherman Act and the Clayton Act, *see* notes 3 & 4, *supra*, with application of the Clayton Act being limited to the sale or lease of commodities. Further, the practice of tying the sale of one product to the buyer's purchase of a second or tied product is currently subject to a rule of per se illegality. *See Northern Pacific Railway Company, supra*, 356 U.S. at 9, 78 S.Ct. at 520 (1958). That tying is subject to per se illegality does not mean that the antitrust plaintiff succeeds merely by showing the existence of a tie-in. Rather, the plaintiff "must also prove that the tie-in involves a not insubstantial amount of commerce in the tied product market and that the seller has appreciable market power over the tying product." Baker, *The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot*, 66 Va.L.Rev. 1235 (1980). Under a per se approach, once the antitrust plaintiff has shown these elements, the practice is "condemned without inquiry into its actual competitive effect." *Id.* at 1237. The per se rule of antitrust illegality is to be distinguished from the rule of reason approach, which would evaluate a challenged practice on the basis of its actual impact on competition. *See* L. Sullivan, Handbook on the Law of Antitrust 171–74 (1977). Professor Baker argues that certain tensions inherent in a per se approach to tying illegality as a result of a more economic approach to antitrust law by the Court may result in a move closer to rule of reason analysis. *See generally Baker, supra*.

6. At the time relevant to the suit, section 4 of the Clayton Act, 15 U.S.C. § 15, provided:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

7. 28 U.S.C. § 1292(b) provides that:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

8. Fed.R.Civ.P. 54(b) provides in pertinent part that:

When more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

1981. In the September 2 order, we consolidated the antitrust defense appeal with the appeal of the antitrust counterclaim dismissal.

*Issues*

On appeal, Avondale argues that: (1) the district court erred in dismissing Avondale's antitrust counterclaim on the pleadings because the Clayton Act four-year statute of limitations had run; and (2) the district court erred in deciding on the pleadings that Avondale's antitrust defense was improper.

II. *Dismissal of the Antitrust Counterclaim*

1. *The Standard for Rule 12(b)(6) Dismissals*

We begin our examination of the dismissal of the antitrust counterclaim by observing that "the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." Wright & Miller, Federal Practice and Procedure: Civil § 1357 at 598 (1969). In *Barber v. Motor Vessel "Blue Cat,"* 372 F.2d 626, 627 (5th Cir. 1967), we wrote that dismissal of a claim on the basis of barebones pleadings is a "precarious disposition with a high mortality rate." *See also Voter Information Project, Inc. v. City of Baton Rouge,* 612 F.2d 208, 210 (5th Cir. 1980); *Madison v. Purdy,* 410 F.2d 99, 100–01 (5th Cir. 1969); *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service,* 400 F.2d 465, 471 (5th Cir. 1968).

Within the strong framework of policy considerations that militate against granting motions to dismiss for failure to state a claim,[9] we have developed two primary principles that guide our review of a complaint so dismissed. First, we must accept as true all well pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. *Miller v. Stanmore,* 636 F.2d 986, 988 (5th Cir. 1981); *Voter Information Project, Inc., supra,* 612 F.2d at 210; *Madison, supra,* 410

F.2d at 100. Second, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Dike v. School Board of Orange County, Florida,* 650 F.2d 783, 787 (5th Cir. 1981); *Miller, supra,* 636 F.2d at 992; *Fadjo v. Coon,* 633 F.2d 1172, 1174 (5th Cir. 1981).

These two principles are, however, subject to the following limitations. Although we must accept as true the well-pleaded allegations of a complaint dismissed for failure to state a claim, we do not accept as true conclusionary allegations in the complaint. *Associated Builders, Inc. v. Alabama Power Company,* 505 F.2d 97, 100 (5th Cir. 1974). Further, a complaint that shows relief to be barred by an affirmative defense, such as the statute of limitations, may be dismissed for failure to state a cause of action. *United Transportation Union v. Florida East Coast Railway Company,* 586 F.2d 520, 527 (5th Cir. 1978); *Mann v. Adams Realty Company, Inc.,* 556 F.2d 288, 293 (5th Cir. 1977); *Joe E. Freund, Inc. v. Insurance Company of North America,* 370 F.2d 924, 924 (5th Cir. 1967); *J. M. Blythe Motor Lines Corporation v. Blalock,* 310 F.2d 77, 78 (5th Cir. 1962); *Herron v. Herron,* 255 F.2d 589, 593 (5th Cir. 1958).

2. *The "Tying" Counterclaim*

The essence of Avondale's counterclaim is that it deserves antitrust damages and equitable relief because the contract involves an illegal "tying" arrangement whereby Kaiser conditioned its sale of the insulation spray (the "tying" product) on Avondale's agreement to permit Kaiser to supply the aluminum tank portion of the cargo containment system (the "tied" product). The alleged tie, Avondale argues, violates sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 3 of the Clayton Act, 15 U.S.C. § 14. The difficulty arises because of the four-year statute of limitations provided by the Clayton Act.[10] In its counter-

---

9. *See* Wright & Miller, Federal Practice and Procedure: Civil § 1357 at 599–605 (1969).

10. At the time relevant to this suit, section 4B of the Clayton Act, 15 U.S.C. § 15b provided that:

claim, Avondale admits that the contract with Kaiser that forms the basis of the present lawsuit filed in 1979 was executed on or about May 25, 1973—a date ostensibly outside the limitations period. The counterclaim on its face appears to reveal the existence of an affirmative defense to it, which would make the granting of a Rule 12(b)(6) dismissal proper.

Generally, an antitrust cause of action accrues, and the four-year statute of limitations begins to run, when a defendant commits an act that injures a plaintiff's business. There are two grounds for allowing an antitrust suit to be brought more than four years after the events that initially created a cause of action. These grounds are derived from *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

The first ground is the continuing conspiracy or continuing violation exception that permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation. *See Zenith, supra,* 401 U.S. at 338–40, 91 S.Ct. at 806–07;[11] *Hanover Shoe, supra,* 392 U.S. at 501 n. 15, 88 S.Ct. 2236 n. 15.[12]

The second ground involves situations where the defendant's antitrust act is "revived" outside the limitations period, as a basis for damages, because when the act originally occurred, the plaintiff's damages were speculative or unprovable. *See Zenith, supra,* 401 U.S. at 339–40, 91 S.Ct. at 806–07.[13]

In the present case, Avondale invokes two versions of the continuing violation argument, as well as the speculative damages argument. Although these exceptions are ostensibly separate, there is some relation between them. Our decision in *City of El Paso v. Darbyshire Steel Company, Inc.,* 575 F.2d 521, 523 (5th Cir. 1978),

---

Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections.

11. *Zenith* arose out of a counterclaim by Zenith Radio against Hazeltine Research in which Zenith accused Hazeltine of participating in certain patent pools, restricting Zenith's operations in a manner violative of the antitrust laws. In rejecting Hazeltine's argument that 15 U.S.C. § 15b permits recovery only of those damages caused by overt acts committed during the four-year period, the Court stated that "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." 401 U.S. at 338, 91 S.Ct. at 806. The Court observed, however, that when a continuous antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants:

In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act.

401 U.S. at 338, 91 S.Ct. at 806.

12. *Hanover Shoe* involved no conspiracy; rather, the plaintiff shoe manufacturer sued the single defendant shoe machine manufacturer and distributor, claiming that the defendant's policy of leasing and refusing to sell its shoe machinery was an instrument of unlawful monopolization. The defendant argued that it first refused to sell its machinery to the plaintiff in 1912, and plaintiff was, therefore, barred from bringing its suit in 1955 by the applicable Pennsylvania statute of limitations. The Supreme Court agreed with the Third Circuit's rejection of this argument:

We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on [the plaintiff].

392 U.S. at 501 n. 15, 88 S.Ct. at 2236 n. 15.

13. In *Zenith,* the Court stated:

[I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.

401 U.S. at 339, 91 S.Ct. at 806.

*cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), established a relationship between the continuing violation exception in *Zenith* and *Hanover Shoe* and the speculative damage exception in *Zenith.* In *El Paso,* we made application of one version of the continuing violation exception—the continuing benefits exception (receipt of benefits under the contract is a continuing violation of the antitrust laws)—contingent on whether antitrust damages were ascertainable at the time of the original antitrust violation. Because of this relationship, it is necessary for us to consider Avondale's speculative damages argument in the context of its continuing benefits argument.

### A. Continuing Violations: The Acceptance of Benefits and Speculative Damages

Avondale argues that Kaiser committed a continuing violation of the antitrust laws by accepting benefits under its subcontract with Avondale. The "prime example" of these benefits is, according to Avondale, Kaiser's continued receipt of contract payments. Avondale's primary support for this argument is our decision in *Imperial Point Colonnades Condominium, Inc. v. Mangurian,* 549 F.2d 1029 (5th Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), where unit owners in a condominium complex claimed that a sales contract requirement that the condominium purchasers also accept assignment of a portion of a ninety-nine year recreational facility lease as a condition of purchasing a unit constituted an illegal tying arrangement. The recreational lease provided that the rent due under it could be adjusted, at the election of the defendants,[14] to maintain the real purchasing power of the rent. In 1969, the

plaintiffs signed a sales contract with the incorporated lease provision; they brought suit in 1975 after the defendants imposed a rent increase. The plaintiffs sought damages and equitable relief, and the defendants pleaded the statute of limitations and laches.

We reversed the district court in *Imperial Point* and held that the plaintiffs' suit was not barred by the statute of limitations because every time the defendants increased the rent under the recreational lease, they accepted a benefit that was equivalent to committing an overt act in furtherance of the " 'conspiracy among defendants the object of which was establishment of a continuing relationship with individual plaintiffs,' " 549 F.2d at 1043 (quoting *Baker v. F & F Investment,* 420 F.2d 1191, 1200 (7th Cir.), *cert. denied* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970)).

In the present case, Avondale seeks to analogize its situation to that of the condominium owners in *Imperial Point,* and argue that Kaiser's continued receipt of benefits under the contract constitutes a continuing violation of the antitrust laws.

We must reject Avondale's contentions under the limitations we placed on the continuing violation benefit exception in *City of El Paso v. Darbyshire Steel Company, Inc.,* 575 F.2d 521 (5th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979).

In *El Paso,* the City of El Paso, Texas, brought suit against several steel fabricators, claiming that the defendants conspired to submit a collusive bid on steel required for the construction of a city civic center. The contract between the defendants and

---

14. The defendants in *Imperial Point* were Mangurian and Drexel Properties, Inc., of which Mangurian was president, director, and sole stockholder. Drexel Properties owned the actual condominium units and Mangurian owned the adjacent land on which recreational facilities had been built. Mangurian leased the land to Drexel Properties and contracts of sale for the units required that each purchaser accept assignment from Drexel Properties of an undivided interest of a portion of the lease, and assume an obligation to Mangurian for rent.

We noted that in *Imperial Point,* the tying arrangement was different from the typical single-defendant tie-in because the unit owners agreed with one defendant to buy the tying product (the condominium), and agreed with another defendant to assume an obligation to pay rent for the tied product (the recreational facilities). 549 F.2d at 1042–43. We held that the defendant could not "escape suit via the statute of limitations by splitting itself into two separate legal entities and causing one of them to force plaintiff to buy the tied product from the other one." *Id.* at 1043 n. 24.

the general contractor was executed in 1970 and El Paso sued in 1975. El Paso argued that because the defendants received benefits under the contract in the form of payments for deliveries of steel within the limitations period, the suit was not barred by 15 U.S.C. § 15b.

Our examination of the contract involved in *El Paso* revealed that

> the rights and liabilities of the parties were finalized by the contract signed on September 4, 1970. On that date, the price, the quantity, and the delivery schedule were fixed by the terms of the contract. Any damages caused by the alleged conspiracy were provable with certainty on that date.

575 F.2d at 523.

The nature of the *El Paso* contract led us to two conclusions. First, we determined that the plaintiff felt " 'the adverse impact of an antitrust conspiracy on a particular date,' " 575 F.2d at 523 (quoting *Zenith, supra*, 401 U.S. at 339, 91 S.Ct. at 806 (1971)). Second, we held that the damages caused by the alleged conspiracy among the steel fabricators were provable by expert testimony concerning the value of steel in a freely competitive market. Therefore, the pre-limitations collusion amongst the steel fabricators could not be "revived" on the grounds that an antitrust cause of action does not accrue until damages can be reasonably established. *See Poster Exchange, Inc. v. National Screen Service Corporation*, 456 F.2d 662, 667 (5th Cir. 1972), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). *See also Zenith, supra*, 401 U.S. at 339–40, 91 S.Ct. at 806–07. In *El Paso*, we distinguished *Imperial Point* as a case involving damages that were not ascertainable at the time of the execution of the contracts involved therein because the defendants could arbitrarily and unilaterally continue to engage in acts that amounted to overt acts in furtherance of their antitrust conspiracy. 575 F.2d at 523–24.

In so analyzing the *El Paso* case, we established the principle that the continuing benefits aspect of the antitrust statute of limitations was not applicable to those situations where antitrust damages were not speculative or unprovable.

The present case involves a contract similar to the one in *El Paso*. Kaiser agreed to supply Avondale with both the insulation spray and tank portions of the cargo containment system. The contract had fixed price, quantity, and delivery schedule terms. The rights and liabilities of both parties were established on May 25, 1973—the date on which the parties executed the subcontract. To the extent that Kaiser received benefits under the contract, such receipts were merely "the abatable but unabated inertial consequences of some pre-limitations action," rather than from "some injurious act actually occurring during the limitations period." *Poster Exchange, Inc. v. National Screen Service Corporation*, 517 F.2d 117, 128 (5th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). We restated this proposition in *Imperial Point*:

> [W]here a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitations period, no new cause of action accrues for the damages occurring within the limitations period *because no act committed by the defendant within that period caused them.*

549 F.2d at 1035 (emphasis in original). *See also Barnosky Oils, Inc. v. Union Oil Company of California*, 665 F.2d 74, 81–82 (6th Cir. 1981).

Avondale presents three arguments to attempt to show that its antitrust damages were speculative, and therefore, the continuing benefits theory applies and the contract in the present case is like the one in *Imperial Point* and unlike the one in *El Paso*.

First, Avondale argues that Kaiser offered one price in its bid to Avondale for the insulation spray and the tanks, and Avondale was consequently unable to tell to what degree the bid price represented the allegedly inflated price for the tied tanks. Assuming Avondale's contention about Kaiser's refusal to separate the price for the

tying and tied products to be true, there was no greater difficulty in proving antitrust damages in 1973 than there is today. If Avondale sued in 1973, it could have sufficiently established the difference between the value of the tanks in a freely competitive market and the price actually paid to Kaiser by expert testimony, discovery from Kaiser, and the other bids that Avondale claims were submitted to it by Kaiser competitors.

The second argument that Avondale makes is considerably more complex and is related to the measure of antitrust damages in tying cases. In a tying arrangement, "the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market." *Pogue v. International Industries, Inc.,* 524 F.2d 342, 344 (6th Cir. 1975). Further, "[i]n an extraordinary case, the plaintiff might be able to establish a causal relationship between a tying arrangement and other kinds of economic injury." *Id.* at 345. Avondale contends that because its contract contained a changes provision that would cause a price fluctuation in the price that Avondale would ultimately have to pay for the entire cargo containment system, the "price actually paid for the tied product" under *Pogue, supra,* could not be calculated until all changes were performed. (The changes provision concerned the manner in which the parties agreed to handle any alterations of the specifications in the design of the gas containment system.)

The plain language of the Avondale-Kaiser contract indicates that in no event could Kaiser order or approve changes under the changes provision. Although Avondale argues that the originator of each change actually performed is a factual matter to be determined at trial, it does not dispute Kaiser's characterization of the plain language of the agreement, except to note that in some circumstances, changes would occur automatically if particular agency regulations required them. The present contract,

then, is much unlike the one in *Imperial Point* where the defendants alone could unilaterally and arbitrarily raise the rent due under the recreational lease. We also note without further comment, that in *El Paso,* we implicitly rejected an argument that the presence of a changes provision in a contract renders *antitrust* damages unascertainable.[15]

More important, however, is the fact that Avondale does not allege that Kaiser ever sought an inflated price for the work ordered by Avondale under the changes provision. Under the terms of the contract, the compensation due to Kaiser for any changes made was to be either agreed on by the parties, or, in the absence of agreement, a "fair and reasonable" price.

Avondale argues in its reply brief that since "the district court has not interpreted the 'fair and reasonable' provisions . . . there is absolutely nothing in the record to indicate that what would be a 'fair and reasonable' cost for one contractor necessarily would be a 'fair and reasonable' cost for all others." Avondale reply br. at 12. This argument is equivalent to the tenuous position that the district court could interpret such a provision as allowing Kaiser to recover compensation for changes work (that it could not order or approve) amounting to an inflated antitrust-prohibited price. Avondale's argument must be rejected.

Any amounts due under the changes provision do not affect the plaintiff's antitrust damages, and, therefore, the fact that the charges under the changes provision could not, by definition, be ascertained when the contract was executed is irrelevant as to whether Avondale's *antitrust* damages were speculative.

Finally, Avondale appears to argue, without support, that its contract was not "final" under *El Paso* because Avondale had to perform corrective work within the limitations period to correct unsatisfactory work by Kaiser. Avondale misunderstands our holding in *El Paso.* What were considered

---

**15.** In *El Paso,* the City of El Paso argued that a changes provision in the contract with the steel fabricators precluded analyzing the contract as finalizing the rights and liabilities of the parties. *See* El Paso reply br. at 3–4. We ignored this argument in our opinion.

"final" in that case were contract rights and liabilities for the purpose of assessing antitrust damages. Under *El Paso*'s rationale—which established finality for purposes of assessing antitrust damages on the date that the rights and liabilities of the parties with regard to those damages were fixed so as to permit calculation of *antitrust* damages—any subsequent breach-of-*contract* damages (the corrective repairs) are irrelevant to the finality of the antitrust violation.

B. *Continuing Violations: Initiation of Suit, Enforcement of Contract Provisions, Delivery of the Tied Product, and Unsatisfactory Work*

Avondale also argues that Kaiser engaged in a number of continuing antitrust violations apart from its receipt of benefits under the contract. These alleged actions involve: (1) Kaiser's initiation of its suit to recover sums alleged to be owed to it under the changes provision, together with damages for breach of contract; (2) Kaiser's raising of the disclaimer of design responsibility and limitation of damages provisions of the contract in its answer to Avondale's counterclaim; (3) the fact that Kaiser never delivered the allegedly tied aluminum tanks until 1979; and (4) what Avondale claims was highly unsatisfactory work under the contract, thus compelling Avondale to perform additional work within the prescriptive period to correct inadequate performance. This fourth "violation" was also argued by Avondale to show that its rights and liabilities under the contract were not finalized, thus precluding our analysis of this case under the principle we espoused in *El Paso*. *See* our discussion above for our treatment of Avondale's argument in that context.

The only specific support that Avondale offers to show that these acts constitute continuing violations concerns Kaiser's initiation of the suit. Avondale relies on *Weber v. Consumers Digest, Inc.*, 440 F.2d 729, 731 (7th Cir. 1971), and *Thomas v. Petro-Wash, Inc.*, 429 F.Supp. 808, 812 (M.D.N.C. 1977), which held that antitrust conspirators engaged in an overt act in furtherance of the conspiracy for statute of limitations purposes when they filed suit to enforce the actual conduct that was claimed to be violative of the antitrust laws. Under a *Zenith* analysis, initiation of a suit in such situations would be an act that caused the plaintiff an antitrust injury. *See* 401 U.S. at 338–39, 91 S.Ct. at 806. In the present instance, however, Kaiser has instituted a suit to recover amounts allegedly owed to it under the changes provision of the contract and not to enforce the tie-in. If Avondale suffered antitrust damage, it was the result of a tying arrangement; initiation of a suit to recover the "fair and reasonable" price of changes that Kaiser could not even order or approve cannot be said to cause any of the *antitrust* injuries of which it complains. *See Woodbridge Plastics, Inc. v. Borden, Inc.*, 473 F.Supp. 218, 222 (S.D.N.Y.), aff'd, 614 F.2d 1293 (2d Cir. 1979).

For the proposition that these four acts constitute continuing violations Avondale relies generally on *Poster Exchange, supra,* 517 F.2d 117 (5th Cir. 1975); *Twin City Sportservice, Inc. v. Charles O. Finley & Company, Inc.*, 512 F.2d 1264 (9th Cir. 1975); and *Baker, supra,* 420 F.2d 1191 (7th Cir. 1970). Although these cases support the proposition that continuing violations of the antitrust law give rise to new causes of action for purposes of the antitrust statute of limitations, Avondale's reliance on them is misplaced because the harm that creates the new cause of action must be "*antitrust* harm, i.e., a continuing injury to *competition*, not merely a continuing pecuniary injury to a plaintiff." *Electroglas, Inc. v. Dynatex Corporation*, 497 F.Supp. 97, 105 (N.D.Cal.1980) (emphasis in original).

In *Poster Exchange*, we held that the statute of limitations did not bar plaintiff's claim for relief based on overt acts in furtherance of an antitrust conspiracy, which acts amounted to continued exercise of monopoly power to prevent plaintiff from obtaining certain articles. *See* 517 F.2d at 125–26. In *Twin City Sportservice*, the Ninth Circuit held that the statute of limitations did not bar an antitrust challenge to an exclusive baseball stadium concession franchise even though the allegedly last damaging act (amendment of the contract)

occurred outside the limitations period. Each time the parties dealt with each other exclusively because of the franchise agreement, the antitrust harm to the plaintiff "recurred." *See* 512 F.2d at 1270.[16] Finally, in *Baker*, the Seventh Circuit found no statute of limitations problem where there was an antitrust conspiracy "the object of which was the establishment of a continuing relationship with individual plaintiffs." 420 F.2d at 1200.

Assuming Avondale's allegations to be true, nevertheless, the "acts" that Kaiser committed can in no way be construed to represent separate *antitrust* violations that give rise to new causes of action under the antitrust laws. The antitrust laws were enacted for " 'the protection of *competition* not *competitors.*' " *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). *See also Electroglas, supra*, 497 F.Supp. at 105. The claimed injury to competition in the present case occurred when the alleged tie-in was formed, thus precluding Avondale from purchasing the aluminum tanks from one of Kaiser's competitors. The acts that Avondale alleges constituted continuing violations of the antitrust laws are acts that may have resulted in pecuniary injury to Avondale; they do not, however, constitute acts injurious to plaintiff as antitrust damage.

### C. *Tolling of the Statute of Limitations by Duress*

▮ Avondale next argues that the four year statute of limitations was tolled by Kaiser's duress and remained suspended at least until its discovery of the allegedly defective nature of the insulation spray in 1979.[17] As far as we understand Avondale's argument, the duress it complains of ema-

nates from two separate sources. First, Avondale complains of the duress inherent in the tying arrangement: "Kaiser used its position as sole supplier of [the insulation spray] . . . to cause Avondale, as a result of duress and coercion, to enter into the Kaiser subcontract." Avondale br. at 32. Second, Avondale claims that Kaiser used duress to prevent Avondale from bringing suit at an earlier time. Avondale does not allege any specific threat or action undertaken by Kaiser from which it could conclude the existence of this duress. Rather, Avondale's sole support for this aspect of its duress claim is that "Avondale surely could reasonably conclude that institution of such litigation would trigger refusal by Kaiser to complete performance of the . . . work." *Id.*

Both aspects of Avondale's duress argument are without merit. With respect to Avondale's claim that the duress was inherent in the tie, we observe that if Avondale's argument were accepted, then the four-year statute of limitations in antitrust actions would never begin to run in tying cases. This conclusion contravenes the plain language of 15 U.S.C. § 15b, which establishes a statute of limitations for antitrust actions, including tying actions. The essence of a tying arrangement *is* coercion and duress: In order to obtain the desired tying product, a party is virtually forced to accept the undesired tied product. Acceptance of Avondale's argument would effectively nullify the existence of a statute of limitations in tying cases.

The only support offered by Avondale for its argument that the tying arrangement inherently involved duress is *McAlpine v. AAMCO Transmissions, Inc.*, [1977] Trade Reg.Rep. (CCH) ¶ 61,359 (E.D.Mich.1977), which held that a material issue of fact was presented when the plaintiffs alleged that they did not bring their tying claim within the four-year period because the defendant fraudulently promised to cease its imposi-

---

**16.** Although the Ninth Circuit held that the antitrust claim was not barred by the statute of limitations because of the "necessarily continuing nature of the alleged harm," 512 F.2d at 1270, it dismissed the tying cause of action because two separate products were not involved in the alleged tie-in. *Id.* at 1276.

**17.** Antitrust damage actions must be "commenced within four years after the cause of action accrued," 15 U.S.C. § 15b, plus any additional number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).

tion of the tie-in as part of an earlier settlement agreement. Although the court mentioned without comment that "[p]laintiffs also argue that . . . defendants utilized duress to prevent plaintiffs from commencing suit on their tying claim," there was no indication that plaintiffs had merely assumed duress inherent in the tie. From the context of the court's discussion of the defendant's alleged fraud during the limitations period, the more probable inference is that plaintiff alleged specific acts of duress. In any event, the *McAlpine* court was far more concerned with the alleged fraudulent promise to stop tying activities.

As to Avondale's claim that Kaiser's duress consisted in Avondale's "reasonable conclusion" that if it sued Kaiser, Kaiser would refuse to perform, we are similarly perplexed. Our confusion owes not in the least to Avondale's reliance on cases that indicate the very restricted scope of the duress defense in antitrust statute of limitations contexts. *See Cooper v. Fidelity-Phila. Trust Co.*, 201 F.Supp. 168, 170 (E.D. Pa.1962); *Philco Corporation v. Radio Corporation of America*, 186 F.Supp. 155, 162 (E.D.Pa.1960). More perplexing, however, is that *Philco* holds specifically that "*anticipated* duress does not establish . . . a legal defense." *Id.* at 162. Avondale, like the plaintiff in *Philco*, does not "allege a single act or threat . . . which could be construed as coercion." *Id.* Rather, Avondale relies *exclusively* on its anticipation of Kaiser's duress. This argument fails as a matter of law.

### D. *Laches*

■ Avondale's final argument with respect to its antitrust counterclaim is that, in addition to treble damages, it sought equitable relief in the form of a permanent injunction against Kaiser to restrain it from enforcing the provisions of the subcontract, and that the district court erred in dismissing its equitable claims on the basis of laches.

■ In an antitrust case, as in other types of cases, an analogous statute of limitations does not necessarily control the ap-

plication in laches in claims brought in equity. Nevertheless, if the plaintiff's claim is brought outside the analogous limitations period, "the bare fact of delay creates a rebuttable presumption of prejudice" to the defendant. *International Telephone and Telegraph Corporation v. General Telephone & Electronics Corporation*, 518 F.2d 913, 926 (9th Cir. 1975). *See also Bratton v. Bethlehem Steel Corporation*, 649 F.2d 658, 667 (9th Cir. 1980); *Boone v. Mechanical Specialties Company*, 609 F.2d 956, 958 (9th Cir. 1979); *Gruca v. United States Steel Corporation*, 495 F.2d 1252, 1258–59 (3d Cir. 1974). The plaintiff who delays bringing suit must show that his delay is excusable *and* that there is no prejudice to the defendant. *Russell v. Todd*, 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940).

In the present case, Avondale argues that its delay in bringing suit was excusable because of Kaiser's duress. In our discussion above, we rejected both aspects of Avondale's duress argument. Because the pleadings show no excusable reason for Avondale's delay, its laches argument must fail.

### III. *Dismissal of the Antitrust Defense*

The second portion of this consolidated appeal concerns whether the district court erred in granting Kaiser's Rule 12(f) [18] motion to strike Avondale's antitrust defense. The motion was granted on the basis that, as pleaded, the counterclaim was barred by the four-year statute of limitations. Specifically, Avondale argues that Kaiser is seeking to enforce a contract that is "intrinsically illegal" under the antitrust laws and that this illegality constitutes a valid defense to Kaiser's suit.

■ Although motions to strike a defense are generally disfavored, a Rule 12(f) motion to dismiss a defense is proper when the defense is insufficient as a matter of law. *Anchor Hocking Corporation v. Jacksonville Electric Authority*, 419 F.Supp. 992, 1000 (M.D.Fla.1976). *See also Lunsford v. United States*, 570 F.2d 221, 228 (8th Cir. 1977); 2A Moore's Federal Practice ¶ 12.21 at 2437 (2d ed. 1948); Wright & Miller,

---

**18.** *See* note 2 *supra.*

Federal Practice and Procedure: Civil § 1381 at 799–800 (1969). The issue that we must decide, then, is whether the antitrust defense in this context is insufficient as a matter of law.

For the most part, Avondale and Kaiser rely on the same cases in arguing the sufficiency point, but they come to different conclusions about what the appropriate sufficiency standard is. According to Avondale, the sufficiency of the antitrust defense in contract actions is to be determined by deciding whether the contract is or is not "intrinsically illegal." Avondale argues that the contract involved is intrinsically illegal in that it embodies a tying arrangement; therefore, the alleged antitrust illegality is not merely a collateral matter, and it infects the entire contract. Kaiser responds that sufficiency of the antitrust defense turns on whether the rejection of the defense would be tantamount to having the court enforce the precise conduct that the antitrust laws forbid. Since Kaiser does not seek enforcement of the actual tie-in, and only seeks the fair and reasonable value of work done by it under the changes provision, Kaiser argues that striking the defense would not have the effect of permitting enforcement of conduct prohibited by the antitrust laws.

Violations of the antitrust laws as a defense to actions on a contract were discussed by the Supreme Court initially in *Connolly v. Union Sewer Pipe Company*, 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902). In *Connolly*, the defendant buyers attempted to escape an obligation to pay for sewer pipe on the ground that the seller of the pipe was engaged in monopolistic activity calculated to raise the price of the pipe. In rejecting this putative antitrust defense, the Court stated:

> The defence cannot be maintained. Assuming, as defendants contend, that the alleged combination was illegal if tested by the principles of the common law, still it would not follow that they could, at common law, refuse to pay for pipe bought by them under special contracts with the plaintiff. The illegality of such combination did not prevent the plaintiff corporation from selling pipe that it obtained from its constituent companies or either of them. It could pass a title by a sale to anyone desiring to buy, and the buyer could not justify a refusal to pay for what he bought and received by proving that the seller had previously, in the prosecution of its business, entered into an illegal combination with others in reference generally to the sale of [the] . . . pipe.

184 U.S. at 545, 22 S.Ct. at 434.

*Connolly* was distinguished by the Court in *Continental Wall Paper Company v. Louis Voight & Sons Company*, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909), in which the contract sued upon was not deemed to be collateral to the alleged antitrust violation because the contract was "*based upon agreements that were and are essential parts of an illegal scheme.*" 212 U.S. 261, 29 S.Ct. at 291–92 (emphasis in original). In such an instance, the Court in *Continental* refused to "give effect . . . to agreements that constituted that combination, and by means of which the combination proposes to accomplish forbidden ends." *Id.* at 262, 29 S.Ct. at 292. This distinction between *Continental* and *Connolly* was explained in a later case as turning on whether the contract sued upon was "intrinsically illegal" or whether the antitrust violation was merely collateral to the contract. *See Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219 (1947).

*Continental* was given a very restricted reading by the Court in *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).[19] In that case, Kelly threatened Kosuga, an onion grower, that he, Kelly, would dump 1000 carloads of onions on the

---

**19.** *Continental* was limited even earlier in *D. R. Wilder Manufacturing Company v. Corn Products Refining Company*, 236 U.S. 165, 177, 35 S.Ct. 398, 402, 59 L.Ed. 520 (1915).

Some commentators have construed *Kelly* to represent abandonment of the intrinsically illegal-collateral distinction. For example, von Kalinowski states: "Although not expressly overruling the *Continental Wall Paper* case, the *Kelly* Court abandoned the distinction made . . . [in *Continental*] between contracts inherently illegally and those which are only collat-

futures market to depress prices unless Kosuga and other onion growers purchased some of these onions. Kosuga agreed to purchase 50 carloads, and also agreed not to deliver any of these onions on the futures market for the remainder of the season in order to create " 'a false and fictitious market condition.' " 358 U.S. at 517, 79 S.Ct. at 430 (quoting Kosuga's brief). When Kelly sued Kosuga for the purchase price of the 50 carloads that Kosuga agreed to buy, Kosuga attempted to raise an antitrust defense based on *Continental.*

In affirming the striking of the defense, the Court noted that "[a]s a defense to an action based on contract, the plea of illegality based on a violation of the Sherman Act has not met with much favor in this Court." 358 U.S. at 518, 79 S.Ct. at 431 (footnote omitted). The reasons for this lack of success, the Court went on to explain, were that the antitrust laws provided remedies that "could not be added to judicially by including the avoidance of private contracts as a sanction," *Id.* at 519, 79 S.Ct. at 431, and that "the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act." *Id.* The Court quoted sympathetically Justice Holmes's dissent in *Continental* : The courts are to be guided by the policy " 'of preventing people from getting other people's property for nothing when they purport to be buying it.' " *Id.* 358 U.S. at 520–21, 79 S.Ct. at 432 (quoting *Continental, supra,* 212 U.S. at 271, 29 S.Ct. at 296 (Holmes, J., dissenting)).

In discussing the "narrow scope" of the antitrust defense, the Court in *Kelly* distinguished *Continental* as a case where striking the antitrust defense would "make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." *Id.* 358 U.S. at 520, 79 S.Ct. at 432. The Court concluded:

Accordingly, while the nondelivery agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed, it can hardly be said to enforce a violation of the Act to give legal effect to a completed sale of onions at a fair price. . . . [W]here, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question.

The restrictive *Kelly* approach was reinforced in *Kaiser Steel Corporation v. Mullins,* —— U.S. ——, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982).[20] This court has had occasion to apply the restrictive *Kelly* analysis on a number of occasions. *See Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.,* 644 F.2d 455, 458–59 (5th Cir. 1981); *Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39, 54–55 (5th Cir. 1976); *Abercrombie v. Lum's, Inc.,* 531 F.2d 775, 778–79 (5th Cir. 1976); *Response of Carolina v. Leasco Response, Incorporated,* 498 F.2d 314, 319 (5th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). In both *Abercrombie* and *Carpa,* we applied the Kelly rule in a tie-in context.

The thrust of Avondale's argument is that *Continental* establishes the proposition that if the underlying agreement sued upon has any taint of antitrust illegality, then the entire agreement is subject to the antitrust defense. We must reject this argument. Contrary to Avondale's assertions, *Continental* did not sire the distinction Avondale seeks to make between "intrinsically illegal" contracts and those contracts merely collateral to an illegal agreement. Rather, *Continental* involved a situation where the Court permitted the defendant to assert the antitrust defense because the

---

eral to the alleged activities." 15 von Kalinowski, Antitrust Laws and Trade Regulation § 109.06 at 109.37 (1981).

**20.** Kaiser also argued that because performance under the contract is now complete, and not executory, Avondale cannot interpose the

antitrust defense. This position must be rejected because of the Supreme Court's recent decision in *Mullins.* The Court affirmed the *Kelly* standard, but rejected the view that application of the restrictive approach of *Kelly* was contingent on whether the contract was executory or not.

contract sued upon was considered to be one of a number of agreements that constituted, in and of themselves, the illegal scheme. *Continental* did not involve one party trying to enforce an "innocent" provision of a contract that involved antitrust illegality; the entire contract was infected by illegality because the contract, and those like it, were responsible for the existence of the illegal combination in the first instance.

It is clear from *Kelly* that the *Continental* rule is restricted solely to those cases where the denial of the antitrust defense "would itself be enforcing the precise conduct made unlawful by the [antitrust law]." 358 U.S. at 520, 79 S.Ct. at 432. *See also Kaiser Steel Corporation v. Mullins,* ── U.S. ──, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). "If the contract provisions [sought to be enforced] do not embody or further anti-competitive practices, then there has been no irreparable loss or damage from a *violation of the anti-trust law.*" *Response of Carolina, supra,* 498 F.2d at 319 (emphasis in original). *See also Abercrombie, supra,* 531 F.2d at 779.

In the present case, Kaiser has instituted a suit for the fair and reasonable price of change-work. Kaiser does not seek to enforce the tie-in by suing a party who has received the desired tying product and now refuses to accept the tied product. Avondale does not allege that Kaiser is requesting an inflated price for the work nor does it allege that the changes provision is a tied item. It argues only that these provisions occur as part of a contract that embodies an allegedly illegal tie-in.

The precise conduct against which the antitrust laws seek to protect in the present context is tying. The change work constitutes an "intelligible economic transaction in itself" under *Kelly,* 358 U.S. at 521, 79 S.Ct. at 432, and the antitrust defense is inapplicable.

Before concluding, we will note briefly several arguments made by Avondale designed to escape the application of *Kelly* to the present case.

First, Avondale argues that Kaiser's reliance on *Carpa v. Ward Foods, Inc.,* 536 F.2d 39 (5th Cir. 1976) is inapplicable because *Carpa's* acceptance of *Kelly* is by way of dictum. Avondale argues that *Kelly* was a "simple collection case," Avondale br. at 27, and did not involve tying, so *Kelly* is not applicable to the present case.

Even if Avondale were correct in its characterization of our application of *Kelly* in *Carpa* as mere dicta, *Carpa* is not necessary to Kaiser's argument. Irrespective of what factual differences exist between *Kelly* and the present case, the specific rationale in *Kelly* encompassed the principle that the antitrust defense is applicable only in one circumstance—where rejection of the defense is tantamount to making the court literally assist a party to commit the precise conduct that the antitrust laws forbid. Since that one circumstance is not present in the case before us, the rationale of *Kelly* is applicable. In addition, we accepted *Kelly* in a tying context prior to *Carpa. See Abercrombie, supra,* 531 F.2d at 778–79.

The real flaw in Avondale's argument, however, is that Kaiser's reliance on *Carpa* is not misplaced. *Carpa* involved a suit for damages suffered as a result of an unlawful tie-in connected with a restaurant franchise. We affirmed on the liability issue. Plaintiff Carpa, a franchisee, cross-appealed a determination of the district court that cancelled the lease that bound Carpa to pay an excessive rental. Carpa argued that if the lease had not been cancelled, he would have suffered more monetary damage that the district court should have trebled. Relying on *Kelly,* we affirmed the district court's refusal to pyramid Carpa's future damages on the grounds that the franchisor could sue to recover a "reasonable price" under the lease, which was collateral to the tying arrangements, 536 F.2d at 55.[21] *Kelly*

---

**21.** Kaiser claims that *Carpa* goes further than Kaiser requires because while Kaiser wants to recover the uninflated price allegedly due to it under the changes provision, *Carpa* "recognized the right of an alleged antitrust violator to recover amounts due and owing on that cancelled lease, even though a portion of those amounts constituted antitrust damages." Kaiser br. at 27. The language in *Carpa* upon which Kaiser relies provides:

was the rationale for our affirmance of the district court's determination of this issue in *Carpa*; our interpretation of the ambit of antitrust defense in *Carpa* can hardly be labeled as "mere dicta."

The second argument that Avondale mounts against application of *Kelly* is that in the present case, the Kaiser spray is defective and since Avondale has not received any of Kaiser's property, "one should not be able to get something for nothing" sentiments are inapplicable. Avondale misses the point. Kaiser has equipped the vessels with a cargo containment system and now seeks the reasonable price of change work. Avondale has received "something" in the form of spray, aluminum tanks, and installation. If Avondale disputes the value of this "something," it has an appropriate remedy in contract or tort.

We conclude that the antitrust defense is inapplicable.

## IV. *Conclusion*

We have examined Avondale's contentions at length and we find them without merit. Even if we assume all of Avondale's allegations to be true, its antitrust counterclaim fails to state a claim, and its antitrust defense is insufficient as a matter of law. Accordingly the dismissal of the counterclaim and the striking of the defense by the district court are AFFIRMED.

AFFIRMED.

---

The lease, as well as the accounts receivable allowed as offsets, were sufficiently collateral to the tying arrangement to be enforceable, *even though a portion of the amounts paid for the lease and the goods sold constituted antitrust damages.* The purchases themselves were not illegal, only the requirement to purchase and the contractual sanctions for failure to do so were violative of the Sherman Act.

536 F.2d at 54 (emphasis supplied). This language, however, must be read in context with a statement that appears in the same paragraph:

"Plaintiffs received tangible items from one who possessed title to the goods, and *the law presumes the expectation of paying a reasonable price for them.*" Id. at 55 (emphasis supplied).

We do not need to construe *Carpa* for present purposes. Nevertheless, we are compelled to observe that the two quotes cited above are consistent with the view that the franchisor can sue for items purchased by the franchisee at inflated prices, but that the franchisor cannot recover more than the "reasonable price" for these items.