**INFORMATION EXCHANGE SYSTEMS, INC., and IXI Laboratories, Inc., Appellants,**

v.

**FIRST BANK NATIONAL ASSOCIATION, Appellee.**

**QWIX MEDIA SHOPS AND DEPOTS, INC., Appellant,**

v.

**FIRST BANK NATIONAL ASSOCIATION, Appellee.**

No. 92–3132.

United States Court of Appeals, Eighth Circuit.

Submitted May 10, 1993.

Decided May 28, 1993.

Rehearing Denied Aug. 5, 1993.

---

John F. Bonner, Minneapolis, MN, argued, for appellants.

Shannon M. O'Toole, Minneapolis, MN, argued, for appellee.

Before BEAM, LOKEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The events as recounted by the parties are difficult to reconstruct. Nonetheless, what follows is a factual summary that is as accurate as we can make it, given the state of the record submitted to us.

Ronald Johnson originally owned three independent but related corporations—Information Exchange Systems (IXI), IXI Laboratories (Labs), and Qwix Media (Qwix). IXI is a research company and holds various patents related to magnetic tape recording (it was previously a subsidiary of Memorex). Labs is a licensee of IXI and manufactures recording and tape duplication equipment (computer diskettes) using the patents owned by IXI. Qwix puts data onto computer disk-

ettes using equipment acquired from Labs (essentially, as we understand it, Qwix is a publisher for software originated by others).

In 1984, Labs borrowed money from a predecessor bank of what is now First Bank. The loan was secured by an interest in the assets of Labs. That loan was also later guaranteed by Qwix; the guaranty was secured by an interest in the assets of Qwix. In 1985, Qwix itself borrowed money from a second predecessor bank of what is now First Bank. Both of these predecessor banks were owned in part by a holding company bank that later merged the predecessor banks into what is now First Bank.

By late 1985 and early 1986, the holding company bank had placed both Labs and Qwix into "workout," which is evidently a state of control by the bank in which the operations of Labs and Qwix were directed, or at least closely supervised, by the bank. Eventually, the bank threatened to foreclose on the collateral for the loan to Labs. The bank gave February 6, 1987, as the deadline for Labs's repayment of the outstanding loan. On that day, however, instead of foreclosing on the collateral, the bank sold the loans of both Labs and Qwix, including the bank's security interests, to two individuals, Ronald Fletcher and Richard McNamara (for the sake of simplicity, F & M). The locks on the buildings holding IXI, Labs, and Qwix were changed on that day, and F & M evidently took physical possession of the buildings and their contents at that time. F & M eventually foreclosed on the collateral for the loans and formed other businesses with the assets of Labs and Qwix obtained through the foreclosure.

In 1991, through two lawsuits that were subsequently consolidated, IXI, Labs, and Qwix sued First Bank in federal court. They asserted federal claims relating to intellectual property (trademarks, copyrights, and patents), antitrust law, racketeering, and unlawful banking practices. They also asserted claims under state statutes and common law. First Bank moved for summary judgment in April and May, 1992. In July, 1992, the trial court granted summary judgment to First Bank on all of the federal claims and declined

to exercise jurisdiction over the state claims. The trial court therefore dismissed the federal claims with prejudice and dismissed the state claims without prejudice. The trial court subsequently denied a motion to reconsider. The plaintiffs appeal.

The plaintiffs contend, initially, that summary judgment was inappropriate while discovery was incomplete. The plaintiffs then assert, as to each of the federal claims, that even with the discovery accomplished at the time of the motions for summary judgment, enough evidence was presented to establish the existence of genuine issues of material fact. The plaintiffs apparently do not appeal the trial court's decision to decline jurisdiction over the state claims. We affirm the trial court[1] in all respects.

## I.

■ In its opinion granting summary judgment to First Bank, the trial court noted that although the plaintiffs had argued "that the motions for summary judgment are premature" in view of discovery disputes that had only recently been resolved by a magistrate, the plaintiffs did not "detail what discovery is outstanding or how it relates to the current motions." The trial court declined, therefore, to postpone ruling on the summary judgment motions.

In its opinion denying reconsideration of the ruling on summary judgment, the trial court stated that the plaintiffs "*now* present detailed materials concerning [the] outstanding discovery ... [but] have not shown why these materials were unavailable before" (emphasis added). The trial court further stated that the plaintiffs "have not shown that discovery subsequently produced or requested would be material to the outcome." The trial court therefore rejected the outstanding discovery as a basis for reconsideration of the ruling on summary judgment.

The plaintiffs' responses to the summary judgment motions were not submitted with the record, so we do not know exactly what the plaintiffs said in their briefs about the outstanding discovery. During the hearing

1. The Honorable Diana E. Murphy, United States   District Judge for the District of Minnesota.

on the summary judgment motions, the only details given to the trial court on that point were that the magistrate had just granted the plaintiffs "access specifically to communications between the bank and [F & M] that we have not *previously* been given" (emphasis added). (The magistrate's order grants access to communications between the bank or its counsel and F & M or their counsel "regarding any matter relating directly or indirectly" to Labs or Qwix, except for documents constituting work product or protected by attorney-client privilege.) Counsel for the plaintiffs then stated, "Clearly this is too early to be saying that this is all we know or all we can discover about these transactions."

Given the vagueness of the plaintiffs' statements to the trial court, and the trial court's own remarks that the briefs "relied heavily upon discovery undertaken in earlier state court actions," we affirm the trial court's refusal to delay ruling on the summary judgment motions. We turn, then, to the merits.

## II.

■ The predicate for all of the plaintiffs' claims is that it was actually First Bank that took over the three businesses on February 6, 1987, and that F & M were only the bank's agents in that takeover, since they did not actually obtain ownership of the outstanding loans, and the concomitant security interests, until nearly two weeks later, when all of the requisite payments were made to the bank and F & M took physical possession of the documents relating to the outstanding loans. As to the intellectual property claims, then, the plaintiffs contend that use of the plaintiffs' trademarks, copyrights, and patents after February 6, 1987, was an infringement by the bank on the plaintiffs' intellectual property rights. The plaintiffs also claim that the bank induced others to infringe the plaintiffs' intellectual property rights. *See* 15 U.S.C. § 1114(1) (trademarks), 17 U.S.C. § 504(a) (copyrights), and 35 U.S.C. § 271(a) (patents).

In its opinion granting summary judgment to First Bank on the intellectual property claims, the trial court held that First Bank had conveyed (apparently by assignment) its security interests in the plaintiffs' intellectual property rights to F & M as of February 6, 1987, and therefore that the plaintiffs had failed to establish any genuine issue of material fact relating to the use of those intellectual property rights by the bank itself, rather than by F & M. Construing an "agreement" between the bank and F & M, and finding the language of that document to be unambiguous, the trial court rejected the plaintiffs' argument that the actual transfer of rights occurred at any time except on February 6, 1987. With respect to inducement to infringe, the trial court stated that the plaintiffs had "pointed to no evidence that First Bank had the requisite intent, knowledge, or constructive knowledge" that F & M "would infringe plaintiffs' rights, assuming for present purposes that they did."

The plaintiffs argue on appeal that there was evidence of a request from Mr. Fletcher to the bank *after* February 6, 1987, for a release of all of the bank's "rights in Labs." The plaintiffs further contend that the "agreement" between the bank and F & M stated that no assignment of the notes would occur until final payment was received; that Mr. McNamara's payment was not received until February 13, 1987; and that the documents relating to the outstanding loans were not delivered to F & M until February 18, 1987. Finally, the plaintiffs contend, the evidence is that it was the bank, and not F & M, that ordered the changing of the locks at the buildings of the three businesses. All of these facts, the plaintiffs assert, allow the factual inference and the legal conclusion that the actual transfer of ownership to F & M took place sometime after February 6, 1987.

It seems to us that the critical evidence is the language in the contract between the bank and F & M. If the language is unambiguous, construction of the contract (and, therefore, determination of the effective date of transfer of ownership) is a matter of law. *See, e.g.,* 4 S. Williston, *A Treatise on the Law of Contracts* § 616 at 649, 651–52 (3d ed. 1961), and 3 A. Corbin, *A Comprehensive Treatise on the Rules of Contract Law* § 554 at 222–25 (1960).

The only "agreement" that we could find in the materials originally submitted to us substantiates the trial court's summary of the relevant language and the trial court's finding that the language is unambiguous. (The "agreement" does refer to another document, an "[a]ssignment," but that second document was not included with the materials submitted in the record. Upon request by the court at oral argument, counsel for the bank subsequently submitted a document of "assignment," dated February 6, 1987, that declares that the bank "hereby assigns" to F & M the notes in question. The plaintiffs object to the addition of that document to the record. We need not decide whether that document may be added to the record, for we find no inconsistency between the terms of the "agreement" that is undisputedly in the record and the terms of the document of "assignment" subsequently submitted to us.) We see no language in the "agreement" making the transfer of ownership conditional on any subsequent payments by F & M. We therefore affirm the trial court's dismissal of the direct infringement claims.

■ As to the inducement claim, the plaintiffs argue on appeal that the bank induced F & M to infringe the plaintiffs' intellectual property rights by representing to F & M that F & M could use the trademarks, copyrights, and patents that secured the outstanding loans (the plaintiffs evidently offer this argument regardless of whether F & M are considered to have been the bank's agents or to have acted on their own behalf). The plaintiffs contend that the security interests originally held by the bank did not include the right to *use* the intellectual property in question; that the bank knew it; that the bank nonetheless told F & M that the intellectual property could be used; that the bank should, therefore, have known that F & M would use that intellectual property; and that F & M did in fact use that intellectual property.

In its opinion granting summary judgment to First Bank, the trial court stated that the plaintiffs made these same assertions at the trial court level "without citation to record evidence." The plaintiffs make no citation to specific evidence in their opening appellate brief, either. The portions of the record cited in the plaintiffs' reply brief, moreover, are inscrutable, ambiguous, or not to the effect ascribed to them. Under these circumstances, we affirm the trial court's dismissal of the inducement claims relating to intellectual property rights.

## III.

The gist of the plaintiffs' antitrust claims is that by taking over and then transferring the plaintiffs' businesses to F & M, First Bank reduced competition and restrained trade in, and attempted or conspired to monopolize, the marketplace for diskettes and their duplication. *See* 15 U.S.C. § 1, § 2, § 15(a), § 18. Qwix also alleges that by requiring it to guarantee the loan to Labs, to secure that guarantee with Qwix's assets, and to submit to bank supervision through "workout," all as a condition of continued credit for Qwix itself, First Bank conspired to restrain trade (in the diskette duplication marketplace, evidently, by increasing Qwix's operating costs compared to those of other diskette duplication businesses; the effect on competition in the banking industry is addressed through Qwix's claim with respect to unlawful banking practices). *See* 15 U.S.C. § 1, § 15(a).

In its opinion granting summary judgment to First Bank, the trial court stated that the plaintiffs had "not shown how competition was suppressed through the actions of First Bank. They fail to define the relevant market, the nature of competition in that market, or any share of the market which F & M may have had before February 6, 1987." The trial court further declared that the plaintiffs' allegations of "loss due to First Bank's assignment of its security interests in their property, and the assignees' subsequent foreclosure," state no antitrust claim. (This declaration implies, we believe, that while the plaintiffs may have been injured by the acts of First Bank, the injuries were not of a nature actionable under the antitrust laws. *See, e.g., Kaiser Aluminum and Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1056 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).) As far as we can tell, the trial court's opinion on summary judgment did not

address the antitrust allegations, made only by Qwix, in relation to the requirements placed upon it by the bank as a condition of continued credit.

■ In their appellate brief, the plaintiffs state that competition was ultimately reduced in the marketplace for diskettes and their duplication, first, because of the takeover of the plaintiffs' businesses by F & M's diskette duplication businesses subsequent to First Bank's takeover of the plaintiffs' businesses, and, second, because of the eventual merger of the plaintiffs' businesses with "long-time competitor MST." Both of those arguments are foreclosed by the determination that F & M, and not the bank, owned the outstanding loans (and the securing collateral) on February 6, 1987. It is undisputed that F & M's own businesses were incorporated after that date. Any subsequent merger, therefore, by F & M of their businesses with the plaintiffs' businesses, and eventually with MST, would be an act by F & M, not the bank. We therefore affirm the trial court's dismissal of the antitrust claims related to the marketplace for diskettes and their duplication.

■ The trial court did not specifically address the antitrust allegations, made only by Qwix, in relation to the requirements placed upon it by the bank as a condition of continued credit. We hold, however, that those claims are barred by the statute of limitations. The limitations period for suits under the antitrust laws is four years. *See* 15 U.S.C. § 15b. A cause of action accrues under the antitrust laws when the defendant commits an act that injures the plaintiff's business. *See, e.g., Kaiser Aluminum,* 677 F.2d at 1051. In the context of banking practices that restrict a plaintiff's options and thus increase its operating costs (so-called tying arrangements), the injury to competition occurs when the alleged tying arrangement is imposed. *Id.* at 1056.

It is not clear when the arrangements complained of here occurred, but it has to have been before February, 1987, when the bank sold the loans, and their securing collateral, to F & M. Qwix sued the bank in July, 1991, more than four years after February, 1987. The antitrust claims based on the

requirements placed on Qwix as a condition of continued credit, then, are barred unless the bank fraudulently concealed its activities from Qwix. *See, e.g., Kansas City, Missouri v. Federal Pacific Electric Co.,* 310 F.2d 271, 284 (8th Cir.1962), *cert. denied,* 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962), 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 415 (1963).

We see no application of the fraudulent concealment doctrine in the context of the antitrust claims related to the requirements imposed on Qwix as a condition of continued credit. Certainly Qwix knew of those requirements at the time they were imposed. We do not find persuasive Qwix's argument (actually made in the context of its claim with respect to unlawful banking practices) that First Bank's refusal to release certain documents amounts to fraudulent concealment of the " 'facts that are the basis of [Qwix's] cause of action,' " *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir.1984), *cert. denied,* 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985), quoting *Dayco Corp. v. Goodyear Tire and Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975). Those documents may have provided evidentiary proof of facts to be asserted by Qwix in court, but the actual facts themselves, related to the conditions imposed, were known by Qwix as of the time those requirements were placed upon it as a condition of continued credit. Since the statute of limitations was not tolled by fraudulent concealment, the limitations period expired at the latest in February, 1991, well before Qwix sued. We therefore affirm the trial court's dismissal of the antitrust claims related to the requirements imposed on Qwix as a condition of continued credit.

## IV.

The essence of the plaintiffs' racketeering claims is threefold—that First Bank made false representations by mail and by phone (mail fraud and wire fraud), first, between 1985 and 1987, to obtain control of Qwix and Labs and, second, as of February 6, 1987, to defraud Qwix and Labs by leading others to believe that the businesses operated by F & M after that date were the same as those operated before then by Ronald Johnson and

his associates; and that between 1985 and the present, First Bank conspired with F & M to obtain control of and to defraud Qwix and Labs. *See* 18 U.S.C. § 1962(b), § 1962(c), § 1962(d).

In its opinion granting summary judgment to First Bank, the trial court concluded that "[t]here is no indication in the record that the action[s] of First Bank prior to the various negotiations involving [F & M] were related as defined under RICO." Drawing on that conclusion, the trial court stated that the "relevant related conduct" began in December, 1986, and ended on February 6, 1987. The trial court stated further that the few acts "taken by First Bank after that date were ministerial in nature, transferring various documents and performing official tasks necessitated by the February 6 agreement." The trial court held, accordingly, that because "[t]he alleged related acts occurred within a short period of time, ... with no evidence of the threat of any future criminal activity by First Bank," the plaintiffs "are unable to sustain an essential element of their RICO claims" (the pattern requirement).

We construe the trial court's opinion as drawing three separate legal conclusions—first, that the acts of First Bank prior to its involvement with F & M were not sufficiently "related" to be considered part of a racketeering scheme; second, that the acts of First Bank after February 6, 1987, neither amount to nor pose a threat of "continued criminal activity"; and, third, that any conspiracy between First Bank and F & M was of such short duration that it could not support the statutory requirement of a "pattern" of racketeering activity. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232, 239–43, 109 S.Ct. 2893, 2897, 2900–02, 106 L.Ed.2d 195 (1989). We agree with all of those conclusions.

■ On appeal, the plaintiffs argue that First Bank engaged in a scheme between 1985 and 1987 to take over the plaintiffs' businesses and furthered that scheme by mail and by phone. *See* 18 U.S.C. § 1962(b). They cite no specific evidence, however, of motive for such a scheme, particular communications, how those communications were

fraudulent, or how those communications furthered the alleged scheme. Under these circumstances, the plaintiffs have failed to demonstrate both the requisite predicate acts and the requisite relatedness of those acts. *See, e.g., Manion v. Freund*, 967 F.2d 1183, 1186 (8th Cir.1992). We therefore affirm the trial court's dismissal of the non-conspiracy racketeering claims involving the acts of First Bank between 1985 and 1987.

■ As to the acts of First Bank after February 6, 1987, the plaintiffs argue that the bank has continued to participate in conducting the business affairs of the plaintiffs' businesses. *See* 18 U.S.C. § 1962(c). The only specific evidence the plaintiffs offer, however, is that First Bank retains an interest in the proceeds from any eventual sale of the intellectual property rights at issue, and that First Bank has given F & M "further advice on how to use" the plaintiffs' businesses. The plaintiffs point to nothing that we can see that shows how a retained interest in the intellectual property rights amounts to participation in the conduct of the plaintiffs' businesses' affairs. Nor do they offer any examples of the alleged "further advice" given to F & M. Under these circumstances, we agree that no genuine issue of material fact exists on the question of threatened continued criminal activity by First Bank (separate from a conspiracy with F & M) after February 6, 1987. *See, e.g., Lange v. Hocker*, 940 F.2d 359, 362 (8th Cir.1991). We therefore affirm the trial court's dismissal of the non-conspiracy racketeering claims involving the acts of First Bank after February 6, 1987.

■ Finally, it is apparently undisputed that communications between First Bank and F & M began no earlier than late 1986. Since even the plaintiffs acknowledge that by March, 1987, F & M had ownership of the loans, and their securing collateral, we agree that any alleged conspiracy, *see* 18 U.S.C. § 1962(d), could not have lasted longer than three or four months. Under these circumstances, the plaintiffs have failed to establish a conspiracy of sufficient duration to sustain a racketeering claim. *See, e.g., Primary Care Investors, Seven, Inc. v. PHP Health-*

**486**

*care Corp.,* 986 F.2d 1208, 1215–16 (8th Cir. 1993); *see also Lange,* 940 F.2d at 361, and *Terry A. Lambert Plumbing, Inc. v. Western Security Bank,* 934 F.2d 976, 981 (8th Cir. 1991). We therefore affirm the trial court's dismissal of the conspiracy-related racketeering claims.

#### V.

With respect to unlawful banking practices, Qwix is the only plaintiff that makes a claim. The import of that claim is that by requiring Qwix to guarantee the loan to Labs, to secure that guarantee with Qwix's assets, and to submit to bank supervision through "workout," all as a condition of continued credit to Qwix itself, First Bank committed acts prohibited by the federal banking statutes. *See* 12 U.S.C. § 1972(1), § 1975.

In its opinion granting summary judgment to First Bank, the trial court dismissed that claim as barred by the four-year statute of limitations, *see* 12 U.S.C. § 1977(1). The trial court rejected Qwix's argument that First Bank's refusal to release certain documents amounted to fraudulent concealment of facts related to that claim, finding instead that all of the fraudulent concealment alleged by Qwix was in relation to the bank's transactions with F & M and not to the conditions placed upon Qwix. On appeal, Qwix argues that documents related to the conditions placed upon it were withheld by First Bank and therefore that the bank did engage in fraudulent concealment related to the unlawful conduct. We disagree.

A cause of action under the statute at issue accrues when the bank commits the unlawful conduct. *See, e.g., Lancianese v. Bank of Mount Hope,* 783 F.2d 467, 470 (4th Cir.1986). All of the bank's acts in that regard had to have occurred before February 6, 1987, when the bank sold the loans, and their securing collateral, to F & M. Qwix did not file its complaint until July, 1991, more than four years later.

Even though First Bank may have withheld the relevant documents, we have no question that Qwix was aware of the requirements imposed on it at the time they were imposed. *See, e.g., Jackson v. Union Na-*

*tional Bank,* 715 F.Supp. 892, 896 (C.D.Ill. 1989). Under these circumstances, we do not find persuasive Qwix's argument that the statute of limitations should be tolled in regard to the alleged unlawful banking practices. We therefore affirm the trial court's dismissal of the unlawful banking practices claims.

#### VI.

For the reasons stated, we affirm the judgment of the trial court.