**Hugo W. SCHOELLKOPF, Jr., and Caroline Rose Hunt, Appellants,**

v.

**L.R. PLEDGER, Appellee.**

No. 05–86–00283–CV.

Court of Appeals of Texas, Dallas.

Aug. 25, 1989.

Rehearing Denied Oct. 13, 1989.

Ernest R. Higginbotham, P. Michael Jung, John H. McDowell, Dallas, for appellants.

Mark S. Werbner, Dallas, for appellee.

Before WHITHAM, ROWE and WHITTINGTON, JJ.

## ON REMAND FROM THE SUPREME COURT

WHITTINGTON, Justice.

This cause is before us on remand from the Supreme Court of Texas. L.R. Pledger[1] cross-claimed for damages against Caroline Rose Hunt and Hugo Schoellkopf[2] which he alleged were caused by their tortious conduct against Midway Air, Inc., of which he was a shareholder. In our original opinion, we held that Pledger may not recover for torts committed against Midway. *Schoellkopf v. Pledger,* 739 S.W.2d 914 (Tex.App.—Dallas 1987). The Supreme Court reversed our opinion, and remanded the cause to us for considerations of the points we had not addressed. *Pledger v. Schoellkopf,* 762 S.W.2d 145 (1988). We again reverse the judgment of the trial court and render a take nothing judgment.

This case involves the tenants and their leases at an airplane hangar in Addison, Texas.[3] The tenants were Midway Aircraft Sales, Inc., Flight Electronics, Inc., and C & C Aircraft Services, Inc. We begin our recitation of facts in September 1980. At that time the hangar was owned by Cree Ventures, Inc.; Midway was owned by L.R. Pledger, Conald Cox, and Wayne Williams; and C & C was owned by Cox. Midway,

---

1. In certain pleadings and in the judgment, plaintiff is denominated as R.L. Pledger.

2. Hunt and Schoellkopf were married at the time of the alleged tortious conduct and at the time of trial. Although they are now divorced,

this opinion will refer to them as the Schoellkopfs.

3. What follows is an abbreviated recitation of facts. For a comprehensive review, see our original opinion, 739 S.W.2d at 915–917.

pursuant to its lease with Cree Ventures, had the exclusive right to sell airplanes from the hangar. Then, in chronological order, the following occurred:

March 13, 1981: The Schoellkopfs buy C & C from Cox.

Mar 15, 1981: The Schoellkopfs apply for a Cessna dealership with the apparent intent to sell airplanes from C & C's space in a hangar owned by Cree Ventures.

June or July 1981: The Schoellkopfs buy Cox's stock in Midway.

October 28, 1981: Schoellkopfs buy hangar groundlease from Cree Ventures thus becoming landlord to Midway, C & C, and Flight Electronics.

December 1981: Hugo Schoellkopf instructs Mercantile National Bank to cancel his personal guaranty insofar as further loans to Midway were concerned.

Undetermined date: Schoellkopfs assign hangar groundlease to Pumpkin Air, which is wholly owned by Schoellkopfs.

June 1982: Midway declares bankruptcy.

Pledger alleges that the Schoellkopfs schemed to drive Midway out of business so that C & C could sell airplanes from the hangar unhindered by the lease provision giving Midway exclusive mercantile rights. Pledger alleges that the Schoellkopfs induced Midway's partners to consolidate their loans at Mercantile National Bank and then precipitously withdrew their personal guaranties. Further, Pledger alleges the Schoellkopfs threatened to segregate space and generally disrupt the use of the hangar by Midway, and caused Midway's insurance to be terminated. The jury awarded to Pledger actual and exemplary damages after finding that the Schoellkopfs conspired to eliminate Midway from their hangar, tortiously interfered with Midway's contractual rights, and engaged in unfair competition against Midway. In our original opinion, we reversed the judgment in favor of Pledger holding that he could not recover for alleged injury to Midway. *Schoellkopf,* 739 S.W.2d at 918–20. The Supreme Court reversed this Court's judgment, holding that Pledger's inability

to recover for torts against Midway was an issue of capacity which should have been raised by verified denial. *Pledger,* 762 S.W.2d at 145. 32 Tex.Sup.Ct.J. at 103. It remanded the case to this Court for consideration of points of error not addressed in our original decision. On remand, we conclude as follows: (1) Pledger adequately pleaded the cause of action of tortious interference with a contract; (2) there is no independent liability for civil conspiracy; (3) there is no evidence that the Schoellkopfs tortiously interfered with the contract between Midway and Cree Ventures; (4) as a matter of law, the Schoellkopfs could not interfere with other contractual rights asserted by Pledger; and (5) as a matter of law, the Schoellkopfs did not unfairly compete with Midway, as that tort was pleaded by Pledger. Based on the above conclusions, we reverse the judgment of the trial court and render a take nothing judgment.

## I—PLEADING

■ In point thirty-five,[4] the Schoellkopfs assert that Pledger cannot recover under the theory of tortious interference with a contract because that cause of action was not adequately pleaded. Pleadings are sufficient if they fairly notify the other party of the basis of the pleader's claims. *Jackson v. Julian,* 694 S.W.2d 434, 436 (Tex.App.—Dallas 1985, no writ); TEX. R.CIV.P. 45, 47. Fair notice requires that the pleader allege every element of his cause of action so that the opposing party is able to prepare his defense. *Rodriquez v. Yenawine,* 556 S.W.2d 410, 414 (Tex.Civ. App.—Austin 1977, no writ). To sufficiently allege the elements of a cause of action, the court must be able to identify each element in the pleadings. *Fairdale, Ltd. v. Sellers,* 651 S.W.2d 725 (Tex.1982). However, whether each element is identifiable in the pleadings may be determined only after the pleadings are liberally construed. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 186 (Tex.1977). Further, the court must consider the intention of the pleader and treat all reasonable inferences

---

4. We address points of error in the order they were submitted in the briefs on remand.

from the facts alleged as having been sufficiently stated in the pleadings. *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982); *Gulf, Colorado & Santa Fe v. Bliss,* 368 S.W.2d 594, 599 (Tex.1963).

■ A case of wrongful interference with a contract is established by findings that: (1) a contract existed that was subject to interference; (2) the act of interference was willful and intentional; (3) such intentional act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss occurred. *Futerfas v. Park Towers,* 707 S.W.2d 149, 161 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Reference to Pledger's pleadings reveals the following allegations:

Pledger would show that at or about the time the Schoellkopfs, Pumpkin Air, Inc., and/or C & C acquired the Cessna distributorship, Schoellkopf set about and designed a scheme whereby they could eliminate Flite, Pledger, Williams and Midway from the Hangar.

Pursuant to the aforementioned conspiracy and unlawful design and scheme to unfairly compete, tortiously injure the business and property of Pledger, Flite, Williams, and Midway, Defendant Schoellkopf induced Pledger and Williams to allow Cox to sell his one third ownership in Midway to them.

Schoellkopf engaged in a deliberate, sometimes covert and sometimes overt, pattern and practice of disrupting and interfering with Flite, Pledger, Midway, and William's use of the hangar.

[D]amages include, but are not limited to, all those sums of money claimed by Mercantile against Pledger in the above, styled and numbered cause of action, and the lost value of Pledger's shares in Midway Aircraft Sales, Inc.

The above pleadings, when liberally construed, are sufficient to give fair notice of the cause of action. Moreover, the Schoellkopfs acknowledged that they were aware of the cause of action. During a discussion with the court, their counsel stated as follows:

Remember, he has to go by some theory that he has claimed. He [Pledger] has only claimed two: civil conspiracy and tortuous [sic] interference.

We hold that tortious interference with a contract claim was before the court. Point thirty-five is overruled.

## II—CONSPIRACY

■ In point twenty-six, the Schoellkopfs assert that the court erred in rendering judgment for conspiracy, because as a matter of law the Schoellkopfs engaged in no specific unlawful conduct. The gist of a cause of action for conspiracy is damage from the commission of a wrong which injures another and not the conspiracy itself. *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806, 808 (Tex.1979). Therefore, an actionable conspiracy must consist of wrongs that would have been actionable against the conspirators individually. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581 (Tex. 1963). Generally, if an act by one person cannot give rise to a cause of action, then the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons. *Gulf & Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W.2d 83, 102 (Tex.App.—Dallas 1985), *rev'd on other grounds,* 749 S.W.2d 762 (Tex.1987).

Therefore, the jury's findings on conspiracy are relevant only if we find in Pledger's favor on one of the other tort theories pleaded, that is, interference with contract or unfair competition. Because we find that Pledger failed to establish any other substantive tort, we hold there is no independent liability for conspiracy. Point of error twenty-six is sustained.[5]

## III—TORTIOUS INTERFERENCE

We next consider the tortious interference with a contract claim. The contractual rights of Midway involved in the case were its rights under its hangar sublease

---

5. Because we hold that there is no independent cause of action for conspiracy, we need not address points one through six and twenty-four through twenty-five which assert that the evidence was legally and factually insufficient to support the jury findings of conspiracy.

and its rights relating to its loans with Mercantile National Bank. The Schoellkopfs assert that the evidence was legally and factually insufficient to support jury findings in favor of the tortious interference claim. The Schoellkopfs further assert that they were legally privileged in their dealings regarding the hangar sublease and legally justified in their dealings with Mercantile due to their interest as guarantors.

We first address the cause of action as it relates to the hangar sublease, the contractual right at issue being Midway's right to exclusive sale of airplanes from the hangar. Midway's contract was with the following landlords: (1) Cree Ventures, (2) the Schoellkopfs as individuals, and (3) Pumpkin Air, a corporation owned by the Schoellkopfs. The claim requires a different analysis with regard to each landlord.

### III—A

Regarding the contract with Cree Ventures, we will address the legal sufficiency issue. In deciding a no evidence point, we consider only the evidence and reasonable inferences therefrom which, when viewed in their most favorable light, support the jury finding, and we must reject all evidence or reasonable inferences to the contrary. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). We have reviewed the entire record and do not find any evidence that a contract was interfered with before October 28, 1981, the date the Schoellkopfs took control of the hangar groundlease. In fact, both Wayne Williams, Midway's president, and Pledger himself testified that the actions allegedly taken by the Schoellkopfs to eliminate Midway from the hangar occurred after October 28, 1981. Williams testified on direct examination that the first problem arose in January of 1982:

Q How did you become aware that somehow or another now your new landlord was not Mr. Cree but Mr. and Mrs. Schoellkopf?

A Mr. Cree told me.

Q And was it a done deal at that point or was it in advance that you became aware of it?

A Well, it was pretty much a done deal, I guess.

Q So who did Midway now make its rent check payable to each month?

A To Mr. Schoellkopf.

Q And were there any changes in this time frame in the relationship that you all had always had with the new landlords?

A Well, practically speaking there was no relationship there.

Q What happened in that regard, in this time frame?

A Well, we started having trouble with the building manager, a Kent Hoffman who worked for Mr. Schoellkopf.

Q He came in as the building manager once Schoellkopf bought the hangar?

A He was a pilot for Pumpkin and he took over the duties as building superintendent, manager.

Q What kind of business is Pumpkin Air?

A They are an air taxi.

Q And so this Mr. Hoffman comes in to be some kind of manager. What other problems that you alluded to?

A Well, the first problem I guess was that they moved the Cessna dealership into the hangar in December—well, first of January of '82—in violation of the lease.

Pledger, testifying as an adverse witness, indicated that the only act that occurred before January 1982 was that of Schoellkopf withdrawing his guaranty agreement on Midway's bank loan. As previously indicated, Schoellkopf withdrew his guaranty in December 1981, after the Schoellkopfs bought the ground lease. We quote from Pledger's testimony.

Q What occurred before the 1st of January of '82?

A Buddy pulled his guaranty.

Q All right. Anything else happen before the 1st of January of '82?

A Well, a lot of things happened, yes. I don't know what you are pertaining to.

Q  All right.  I am asking you, you know, you have had a lot of complaints about the way you were treated and the problems in the hangar.  Did any of those occur before the 1st of January 1982?

A  Don't believe so, no.

Q  In fact, let me hand you what has been marked Plaintiff's Exhibit 24, which is a letter from—I believe it's been identified as Mr. Williams or perhaps Midway's lawyer—to Mr. Schoellkopf dated January 7, 1982.  Were you aware of that letter on or about the time that it was prepared?

A  Let me read it first.  (Reads document.)  What is the question, please?

Q  Were you aware of that letter at or about the time that it was prepared?

A  Yes.

Q  You talked to Mr. Williams about that before the lawyer did it?

A  Yes.

Q  Were there any events of disagreement or friction in the hangar at any time before the date of that letter from Mr. Williams' lawyer or Mr. Schoellkopf?

A  This is January the 7th.  I don't believe so.

Q  So everything happened after that letter, did it not, Mr. Pledger?

A  You are speaking of the hangar?

Q  Yes, sir.

A  I believe so, yes.

Pledger alleges that the tortious conduct began when the Schoellkopfs bought C & C in March 1981 and included inducing Midway to consolidate loans at Mercantile. Even assuming that is true, such conduct did not interfere with the Midway–Cree Ventures contract.  The undisputed evidence is that business operated as usual during the time Cree Ventures was landlord.  If acquiring C & C and inducing Midway to consolidate loans did constitute interference with a contract, it was to a subsequent contract.  Considering only the evidence and inferences favorable to the verdict, we hold that there is no evidence of tortious interference with the contract between Midway and Cree Ventures.  Points five, seven, and twenty-seven are sustained insofar as they apply to the Midway–Cree Ventures contract.[6]

### III—B

█ We next consider whether a cause of action may be maintained for tortious interference with a contract after the Schoellkopfs bought the hangar groundlease but before it was assigned to Pumpkin Air.  In point twenty-nine, the Schoellkopfs assert that they were legally privileged in the dealings regarding the hangar sublease.  One cannot tortiously interfere with his own contract.  *Frost Nat'l Bank v. Matthews*, 713 S.W.2d 365, 369 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.).  Liability for tortious interference is founded only on the acts of an interfering third party.  J. Edgar & J. Sales, Texas Torts and Remedies § 46.02[4][e] (1988).  Thus, the Schoellkopfs, as a matter of law, cannot be held liable for interfering with the contract between Midway and themselves.  Point twenty-nine, insofar as it relates to the contract between Midway and the Schoellkopfs, is sustained.

### III—C

█ We next consider the contract between Midway and Pumpkin Air.  On appeal Pledger disputes the assertion that Mr. and Mrs. Schoellkopf each owned fifty percent of Pumpkin Air at the time of the alleged tortious conduct.  In his pleading, however, Pledger described Pumpkin Air as "a company owned, controlled and dominated by Defendant Schoellkopf."  Allegations contained in pleadings are conclusive against the pleader, and it is unnecessary for the opposing party to introduce evidence to obtain the benefit of the admissions.  *Klein v. Dimock*, 705 S.W.2d 408, 410 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.).  We nevertheless note that the only evidence adduced at trial was that Pumpkin Air was wholly owned by the Schoellkopfs.

---

**6.** Because we sustain the no evidence point, we do not address the factual insufficiency points numbered six, eight, and twenty-eight.

The issue then is whether the individuals who own, control, and dominate a closely held corporation can tortiously interfere with their corporation's contracts.

The case of *Deauville Corp. v. Federated Department Stores, Inc.*, 756 F.2d 1183 (5th Cir.1985), provides guidance on this issue. In *Deauville*, a shopping mall developer entered into an agreement with Ward Properties Corporation, a real estate subsidiary of Montgomery Ward & Company, to locate a Montgomery Ward Department Store at the plaintiff's shopping center. After the department store located at a competitor shopping mall, suit was brought alleging: (1) Montgomery Ward & Company tortiously interfered with plaintiff's agreement with Ward Properties; and (2) Ward Properties tortiously interfered with plaintiff's prospective business relationship with Montgomery Ward & Company. The Fifth Circuit, in affirming a directed verdict in favor of defendants, discussed the concept of financial interest privilege and set forth the following law:

> [A] plaintiff cannot recover for tortious interference with contract or with business relations if the allegedly interfering third party acted to protect his own legitimate interest. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 90 (Tex.1976). A financial interest superior to that of one of the parties to the contractual or business relationship is one such legitimate interest. *Davis v. Lewis*, 487 S.W.2d 411 (Tex.Civ.App.1972). Stock ownership generally constitutes a superior financial interest that will trigger the privilege. *Consolidated Petroleum Industries, Inc. v. Jacobs*, 648 S.W.2d 363, 367 (Tex. App.1983).

*Id.* at 1196. The court held that due to the financial interest privilege, as a matter of law, neither corporation could tortiously interfere with the other. The court wrote that "the interests of Montgomery Ward and Ward Properties are aligned so closely that we have difficulty even recognizing their separate identity for the purpose of this analysis." *Id.* at 1197.

The *Deauville* case was relied upon in *Baker v. Welch*, 735 S.W.2d 548 (Tex.App. —Houston [1st Dist.] 1987, writ dism'd). Welch operated a lounge on property leased from Houston Helicopters, Inc. (HHI). Baker was founder, sole shareholder, and president of HHI. After a verbal disagreement, Baker notified Welch that HHI had decided to terminate the lease. Welch argued that "Baker, the individual, maliciously used his personal grudge to persuade Baker, the president of HHI, to act, thereby creating liability for tortious interference." *Id.* at 549. The Court of Appeals rejected Welch's cause of action holding that a party to a business relationship cannot tortiously interfere with himself and Baker and HHI "were so closely aligned as to be one entity, guided by one consciousness." *Id.* at 550.

Neither *Deauville* nor *Baker* are exactly on point. In *Deauville*, Ward Properties was the wholly owned subsidiary of another corporation. Here, Pumpkin Air is a corporation "owned, controlled, and dominated" by two individuals. In *Baker*, the claim was for tortious interference with a business relationship. Here, the claim is for tortious interference with a contract. Nevertheless, we believe these distinctions to be insignificant and conclude that the analysis found in *Deauville* and *Baker* is applicable to the facts of this case. The Schoellkopfs and Pumpkin Air had a unity of interest, and can be described, as the court did in *Baker*, as being "so closely aligned as to be one entity." *Baker* 735 S.W.2d at 550. We hold that the Schoellkopfs, as a matter of law, cannot have tortiously interfered with the contract between Pumpkin Air and Midway. Point twenty-nine, insofar as it relates to the contract between Pumpkin and Midway, is sustained.

### III—D

▆▆▆▆ Lastly, we consider the tortious interference claim as it relates to Midway's loans with Mercantile.[7] Pledger claims

---

**7.** Pledger does not discuss this contractual relationship in his brief. However, at oral argument, he described his tortious interference claim as being based ninety percent on the

that the Schoellkopfs' precipitous withdrawal of their personal guaranties caused Midway's eventual downfall. Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract. *Magnard v. Caballero*, 752 S.W.2d 719, 721 (Tex.App.— El Paso 1988, writ denied). Interference with contractual relations is privileged where the party possesses an equal or superior interest to that of the plaintiff in the subject matter. *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d·80, 91 (Tex.1976). The guaranties provided that the guarantors could prevent liability for further advances through written notice. The Schoellkopfs exercised that option and withdrew their continuing guaranty. Because the Schoellkopfs enforced a contract option in which they had a superior interest to Pledger, they cannot be held liable for tortiously interfering with the contractual relationship between Midway and Mercantile. Point thirty is sustained.[8]

### IV—UNFAIR COMPETITION

■■■ The jury found that the Schoellkopfs engaged in "unfair competition" against Midway and that conduct proximately caused damage to Pledger. The following instruction was contained in the jury charge:

> You are instructed that the term UNFAIR COMPETITION, as used herein, is a form of unlawful business injury; while the law protects and encourages competition between business, that competition must be fair and must not run contrary to accepted business ethics. It is legitimate and does not constitute unfair competition for a person or firm to appropriate to itself all the customers it can obtain; even to the extent of driving its competitor out of business, provided the means used to do so do not contravene any law or violate a definite legal right of such competitor.

This instruction is apparently taken from the case of *Featherstone v. Independent Service Station Ass'n*, 10 S.W.2d 124, 128 (Tex.Civ.App.—Dallas 1928, no writ). Pledger has also referred us to the *Featherstone* case in his brief.[9] In point thirty-four, the Schoellkopfs assert that, as a matter of law, their conduct did not constitute the tort of unfair competition as that phrase is used in the *Featherstone* case. We agree.

In *Featherstone*, plaintiff brought suit to enjoin a lottery scheme employed by competitors which was attracting business and trade away from plaintiff's business. The court determined that the lottery was being run in violation of the Texas Penal Code. The court held that "plaintiff's business and his right to conduct the same constitute property that a court of equity will protect from *unlawful* interference or injury." *Id.* at 128 (emphasis ours). Unlawful, as that term was used in *Featherstone*, referred to an act denounced as wrongful by the penal code.[10] In the instant case, the finding of "unlawful" conduct was the jury determination that the Schoellkopfs tortiously interfered with a contract. We have already held that Pledger, as a matter of law, cannot maintain that cause of action. Therefore, it cannot be the "unlawful" conduct required by *Featherstone*. Without some finding of an independent substantive tort or other illegal conduct,

---

hangar groundlease contracts and ten percent on Midway's contract with Mercantile.

**8.** We do not address point thirty-one which asserts that Midway's contractual relationship with Mercantile was terminable at will.

**9.** We note that Pledger asserts unfair competition as described in *Featherstone* because that tort has been defined in manners which do not relate to the facts of this case. *See, e.g., McCarley v. Welch*, 170 S.W.2d 330, 332 (Tex.Civ.App. —Dallas 1943, no writ) (passing off one's products or services as those of another).

**10.** In fact, cases which have relied on *Featherstone* have, unlike the instant case, involved statutory violations. *See, e.g., Gluck v. Texas Animal Health Commission*, 501 S.W.2d 412, 415 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r. e.); *International Brotherhood of Electrical Workers v. Southwestern Bell Tel. Co.*, 498 S.W.2d 504, 506 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.); *Title Ins. Ass'n v. Board of Ins. Com'mrs*, 264 S.W.2d 129, 131 (Tex.Civ. App.—Austin 1954); *Southern Traffic Bureau v. Thompson*, 232 S.W.2d 742, 745 (Tex.Civ.App.— San Antonio 1950, writ ref'd n.r.e.).

we hold that liability cannot be premised on the tort of "unfair competition." Point thirty-four is sustained.

The judgment of the trial court is reversed and a take nothing judgment is rendered.[11]

11. Because we render a take nothing judgment, we do not consider the points relating to damages numbered thirteen through sixteen and thirty-six through forty-A. We also do not consider Pledger's cross-points.