CHEVALIER, Plaintiff,

v.

ANIMAL REHABILITATION CENTER, INC., et al., Defendants.

Civ. A. No. 3:92-CV-489-X.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 13, 1993.

---

Laurence Wade Watts, Stephen Paul Glover, Watts & Glover, Houston, TX, for plaintiff.

Lea Frances Courington, Gwinn & Roby, Dallas, TX, for Animal Rehabilitation Center, Inc., Karen Wakeland.

Stanley I. Weinberg, Levin, Weinberg & Levin, Dallas, TX, Steven M. Wise, Fraser & Wise P.C., Boston, MA, for Primarily Primates, Inc., Wallace Swett.

Nicholas John Lanza, Oldenettel & Associates, Gregg S. Weinberg, Geissel Stone Barker & Lyman, Houston, TX, for Fund for Animals, Inc.

Gregg S. Weinberg, Houston, TX, for Cleveland Amory, D.J. Schubert.

Walter C. Davis, III, William Ayrl Forteith, Walter Locker & Associates, Dallas, TX, for Zephyr Carlyle.

Walter C. Davis, III, William Ayrl Forteith, Walter Locker & Associates, Dallas, TX, Marc David Isenberg, Martinez & Downs, Houston, TX, for Friends of Animals, Inc.

Melanie Bragg, pro se.

## MEMORANDUM OPINION
## AND ORDER

KENDALL, District Judge.

NOW before the Court are Defendants' Joint Motion to Dismiss and in the alternative, for Summary Judgment on All Plaintiff's Claims, filed on June 22, 1993, the response to that motion and the reply to the response. Having considered these filed materials and the applicable law, the Court determines that Defendants' motion, except as to Defendant Zephyr Carlyle, should be, and hereby is, **DENIED.**

This case arises from Plaintiff's attempts to house animals he had imported from Mexico for use in studies related to acquiring his doctorate from the University of California, Irvine. Plaintiff, a zoologist currently employed by the Arizona Game and Fish Department, obtained permits from the Mexican government to import up to eight nocturnal, arboreal animals called "kinkajous" in 1987. The animals resided at Cal–Irvine while Plaintiff completed his work, and when he moved to Arizona after finishing his degree, Plaintiff applied to the State of Arizona for the necessary permits to relocate the animals there. While awaiting those permits, Plaintiff arranged in May or so of 1989 for Defendant Animal Rehabilitation Center, Inc. (ARC), in Midlothian, Texas, to keep the animals. Defendant Karen Wakeland, ARC's director, called Plaintiff on October 13, 1989 and told him that the kinkajous had

escaped from their cages and had not been recaptured. Plaintiff immediately notified local wildlife officials in hopes of regaining the animals.

It is unclear whether the kinkajous actually escaped. It is clear either that they had not escaped or that they had escaped and all but two had been recaptured. In either event, Wakeland, without Plaintiff's knowledge or consent, gave a number of them to Defendant Primarily Primates, Inc., a permanent sanctuary and rehabilitation center for abused, unwanted or abandoned animals, in San Antonio, Texas. Defendants contend that Wakeland told Primates that the animals' owner had abandoned them and that they were to be permanently housed at Primates. Wakeland gave another of the animals to an individual in DeSoto, Texas, and two others remain unaccounted for.

Plaintiff located the missing animals apparently through help from the Texas Rangers. He recovered the one kept in DeSoto, but it had been mutilated by castration, and although Defendant Wallace Swett, Primates' president, initially agreed to return the animals in Primates' possession, he later refused, representing to Plaintiff that a Texas state court had issued an injunction preventing the animals' return. This representation was, apparently, false.

Primates, represented by Defendant Zephyr Carlyle, an animal-rights attorney from San Diego, sued Plaintiff for possession of the kinkajous in a state district court in Bexar County, Texas. Plaintiff alleges that two animal-rights groups, Defendants Fund for Animals, Inc. and Friends of Animals, Inc. financed the lawsuit. During that suit, these animal-rights groups enlisted their members in a letter-writing campaign to the Arizona Game and Fish Department and to Arizona's governor against Plaintiff's work with the kinkajous. The enlistment occurred through press releases and other publications that contained allegedly defamatory statements about Plaintiff and his work and contained pertinent names and addresses to which people could direct their protests. Although investigations resulted from the campaign, the State of Arizona declined to revoke Plaintiff's permits. Cal–Irvine also in-

vestigated Plaintiff apparently because of the publicity that Defendants stirred up, but took no adverse action against Plaintiff.

Plaintiff's attorneys obtained a TRO from the state court awarding possession of the animals to Plaintiff, who removed them to California. After obtaining his import permit, Plaintiff relocated the animals to Arizona. Evidently, Plaintiff obtained the TRO improperly, because the state district court sanctioned his attorneys $350 and found that he had "secured the Temporary Mandatory Restraining Order in violation of the Rules of Practice, Procedure and Administration in the District and statutory County Courts At Law, of Bexar County, Texas." The court's order, however, allowed the animals to remain in the possession of Cal–Irvine, to which they had been taken after Plaintiff regained them pursuant to the TRO. After regaining possession of the kinkajous, Plaintiff filed a counterclaim against Primates and also sued ARC and Wakeland in the Bexar County suit. The entire lawsuit was ultimately dismissed for want of prosecution.

After the lawsuit, Defendant D.J. Schubert, allegedly calling himself "Dr. Kyle Owens," wrote a letter to the Mexican authorities on behalf of the Fund and induced a Dr. Garcia, who had issued the original permits to Plaintiff, to grant permits for possession of the animals to the Fund. Upon learning of this information, Plaintiff and other scientists contacted Dr. Garcia, who canceled permits to the Fund and reconfirmed Plaintiff's permits.

Plaintiff then filed this suit and alleges the following as causes of action:

> Defendants ... acted in civil conspiracy to intentionally inflict Plaintiff with severe emotional distress, by various acts of outrageous conduct, including, but not limited to:
>
>> Wrongfully removing Chevalier's kinkajous from his control and wrongfully retaining control of the animals.
>>
>> Disseminating falsehoods by mail and open publications for the purpose of enriching Defendants' various coffers and increasing the membership of Fund and [Friends of Animals].

Defendants have acted jointly and severally, whether by civil conspiracy or on behalf of the others, to perpetuate a sham and a fraud to deprive Plaintiff of his kinkajous, professional reputation, and employment.

Upon reading Plaintiff's complaint, one may not be left with a crystal-clear picture of what causes of action he alleges. Consequently, Defendants devote much of their motion to claims for conversion, malicious prosecution and abuse of process. However, Plaintiff states in his response that he asserts none of these. Instead, his response addresses claims for defamation and intentional infliction of emotional distress. Defendants rejoin that Plaintiff's only pleaded causes of action are for civil conspiracy, assert that Arizona law applies and maintain that Plaintiff fails to state a claim on which relief might be granted because Arizona law does not recognize civil conspiracy. Consequently, the Court faces a choice of law question.

The Supreme Court of the United States held in *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that a federal court sitting in diversity jurisdiction must follow the conflicts of law rules prevailing in the state in which the court sits. As a result, this Court applies Texas choice of law principles. Plaintiff's causes of action sound in tort, and therefore the Supreme Court of Texas decision in *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979), pertains here. In that case, the court stated the following:

> Having considered all of the theories, it is the holding of this court that in the future all conflicts cases sounding in tort will be governed by the "most significant relationship" test as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts.

*Id.* at 318. Restatement Section 6 provides as follows:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement Section 145 provides as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ The Court concludes that an analysis under the foregoing test counsels toward application of Texas substantive law. Although the relationship among the parties arguably has connections with several states and one foreign country—Texas, Arizona, California, and Mexico—the entire course of dealing among the parties arose from Plaintiff's attempts to house his animals in Texas, which gave way to their being relocated to another defendant's property in Texas, which gave rise to a lawsuit in Texas, at which time other nonTexas defendants injected themselves into the fray in Texas, which fostered the letter writing campaign and other publications. Four defendants reside in Texas, and the Fund apparently had an office in Houston, Texas while the facts underlying this suit played themselves out between Midlothian and San Antonio.

Defendants argue that because the letters attacking Plaintiff's work with the kinkajous were aimed at Arizona, Arizona law should apply at least to Plaintiff's defamation claim. The letters, however, are not the only basis of that claim, and viewed in the totality of circumstances, the letters do not appear that important. Plaintiff does not sue the host of people who wrote letters to various governmental officials. These letters would represent a large body of correspondence. However, the letters written by the defendants appear not to be numerous. Plaintiff focuses on Defendants' press releases and widely disseminated publications rather than on a large number of letters sent by individuals not parties to this suit who were reacting to Defendants' publicity campaign. The importance of the comparatively few letters that Defendants themselves sent therefore fades.

■ Defendants caused allegedly defamatory statements to be published in their own newsletters and also conducted press releases, all of which caused the allegedly defamatory statements to be distributed in many states and perhaps nationwide. As the Restatement commentary notes, the place of injury will not play an important role in a choice of law analysis in the case of multistate defamation. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. e (1971). Because the parties' relationship was centered in Texas, because Texas was a place of injury, because many of the defendants reside in Texas and those who do not affirmatively injected themselves into the already developing scenario between Plaintiff and the Texas-residing defendants, and because most, if not all, of the conduct giving rise to Plaintiff's alleged injury occurred in or originated in Texas, Texas has the most significant relationship to the causes of action *sub judice,* and it is therefore Texas law that should apply to this action.

Pursuant to Rule 12(b)(6), FED.R.CIV. P., Defendants suggest next that Plaintiff's complaint fails to state a claim on which relief may be granted. A motion under Rule 12(b)(6) tests the legal sufficiency of claims stated in the complaint and must be evaluated solely on the basis of the pleadings. *Jackson v. Procunier*, 789 F.2d 307 (5th Cir. 1986). However, material properly appended to a complaint may receive consideration.[1] *Neville v. American Republic Ins. Co.*, 912 F.2d 813, 814 n. 1 (5th Cir.1990); *Hal Roach Studios v. Richard Feiner and Co.*, 883 F.2d 1429, 1441 n. 18 (9th Cir.1989). The Court must decide whether the material facts alleged, which must be taken as true, *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), would entitle a plaintiff to offer evidence regarding the legal remedy he requests. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Unless the answer is unequivocally "no," the motion must be denied. *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Many courts look askance at Rule 12(b)(6) motions because of the role pleadings play in federal practice and the liberal policy regarding amendment. "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Rios v. Dillman*, 499 F.2d 329 (5th Cir.1974).

The United States Court of Appeals for the Fifth Circuit has established two primary considerations for a court's analysis under Rule 12(b)(6). First, the court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff; however, the court will not accept conclusory allegations as true. *Kaiser Aluminum*, 677 F.2d at 1050. Second, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Id.*

Assuming the application of Arizona law to this case, Defendants assert that no cause of action for civil conspiracy exists under Arizona jurisprudence. *See, e.g., McElhanon v. Hing*, 151 Ariz. 386, 728 P.2d 256, 262 (Ct.App.1985), *aff'd in part and vacated in part*, 151 Ariz. 403, 728 P.2d 273 (Ariz.1986) (*en banc*) (It is the established law of this state that there is no such thing as a civil action for conspiracy) (adopting holding of *Onderdonk v. Lamb*, 79 Wis.2d 241, 255 N.W.2d 507, 509 (1977)). However, Texas law clearly recognizes a cause of action for civil conspiracy, which is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex.1964); *Central Sav. and Loan Ass'n v. Stemmons Northwest Bank, N.A.*, 848 S.W.2d 232, 241 (Tex.App.—Dallas 1992, no writ). The elements of a civil conspiracy are as follows: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Central Sav. and Loan Ass'n*, 848 S.W.2d at 241. The "meeting of the minds" element requires proof of intent to participate in the purpose of the conspiracy. *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 216 (Tex.App.—Houston [14th Dist.] 1991, no writ); *see Roberts v. Harvey*, 663 S.W.2d 525, 527 (Tex.App.—El Paso 1983, no writ).

A civil conspiracy need not be shown by direct evidence and is ordinarily established by circumstantial evidence. *Kirby v. Cruce*, 688 S.W.2d 161, 164 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Vital facts may not be proved, however, by unreasonable inferences or by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968). In light of this well-

---

1. *See* FED.R.CIV.P. 10(c): "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."

developed body of law, the Court determines that Plaintiff does state a claim for civil conspiracy and that Defendants' motion on that score must be denied.

▋ Defendants next switch their procedural focus and assail Plaintiff's defamation claim in the summary judgment context. The summary judgment movant must show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Slaughter v. Southern Talc Co.,* 949 F.2d 167, 170 (5th Cir.1991). The existence of a genuine issue of material fact is determined based on whether a fair-minded jury could return a verdict for the plaintiff based on the evidence presented. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986). The rules allocating the burden of proof guide a court in a summary judgment analysis, *Fields v. City of S. Houston,* 922 F.2d 1183, 1187 (5th Cir.1991), and such allocation depends on the burden of proof that would obtain at trial. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 150 (5th Cir. 1991). The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Russ v. International Paper Co.,* 943 F.2d 589, 591 (5th Cir.1991), *cert. denied,* ——— U.S. ———, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial. *Page v. DeLaune,* 837 F.2d 233, 239 (5th Cir.1988). When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park,* 950 F.2d 272, 276 (5th Cir.1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits and other competent evidence,[2] "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Although a court must "review the facts drawing all inferences most

favorable to the party opposing the motion," *Rosado v. Deters,* 5 F.3d 119, 122 (5th Cir. 1993) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986)), the nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e). However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The existence of a mere scintilla of evidence will not suffice. *Id.* at 252, 106 S.Ct. at 2512. When the nonmoving party fails to make the requisite showing and the moving party has met his summary judgment burden, the movant is entitled to summary judgment. FED. R.CIV.P. 56(c); *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115, 1119 (5th Cir.1992).

Defendants find two infirmities in Plaintiff's defamation claim. First, they argue that the statute of limitations has run, and second, that Plaintiff is a public figure and must therefore carry the heavier burden of showing actual malice after the holding of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Further, Defendants raise issues of absolute privilege under state and federal law, and qualified privilege under state law.

▋ Texas has a one-year statute of limitations for libel and slander. TEX.CIV.PRAC. & REM.CODE ANN. § 16.002. A cause of action for defamation accrues on the date of publication. *Salazar v. Amigos del Valle, Inc.,* 754 S.W.2d 410, 412 (Tex.App.—Corpus Christi 1988, no writ). Defendants assert that the alleged defamatory conduct, which consists mostly of letters and press releases, occurred between November of 1989 and February or April of 1991. All instances of publication except perhaps one, according to Defendants, occurred before December 27, 1990. Because Plaintiff did not file suit until December 27, 1991, his defamation claim is all but extinguished, say Defendants, al-

---

2. *See* FED.R.CIV.P. 56(e).

though a couple of instances of publication might remain.

It is unclear, though, that Plaintiff alleges a cause of action for defamation *qua* defamation; he does assert claims as conspiracy to do X, Y or Z. If Plaintiff asserts a defamation claim against Defendants individually and corporately rather than only corporately, Defendants' logic would be sound and limitations would bar the remedy for individual claims against the defendants, except for the niggling couple of instances occurring after December 27, 1990. Defendants feel that the conspiracy to defame cause of action affords them little trouble, because they believe that if limitations has run on the underlying claim, it also runs on the claim for conspiracy.

 Defendants' argument that limitations running on the defamation claim also time bars a claim for conspiracy to defame is misguided, though. The statute of limitations for civil conspiracy in Texas is two years. *Stevenson v. Koutzarov,* 795 S.W.2d 313 (Tex.App.—Houston [1st Dist.] 1990, writ denied). If the statute having run on an underlying bad act meant that the statute had also run on the conspiracy claim, there would be no need for a separate statute of limitations for conspiracy. Even so, Defendants refer the Court to *Gulf Atlantic Life Insurance Company v. Hurlbut,* 696 S.W.2d 83 (Tex.App.—Dallas 1985), *rev'd,* 749 S.W.2d 762 (Tex.1987), for their proposition. Although that case may support Defendants' contention, it was reversed, and the Court located no other cases directly supporting their argument.

Indeed, the same court of appeals that decided the *Gulf Atlantic Life* case later cited it in the same context as Defendants would put it and with the same "reversed on other grounds" appellation that Defendants gave it in their brief. The court of appeals in the later case, *Schoellkopf v. Pledger,* 778 S.W.2d 897 (Tex.App.—Dallas 1989, writ denied), understood *Gulf Atlantic Life* differently than Defendants, though. Discussing a conspiracy claim, the *Schoellkopf* court stated as follows:

> In point twenty-six, the Schoellkopfs assert that the court erred in rendering judgment for conspiracy, because as a matter of law the Schoellkopfs engaged in no specific unlawful conduct. The gist of a cause of action for conspiracy is damage from the commission of a wrong which injures another and not the conspiracy itself. *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806, 808 (Tex.1979). Therefore, an actionable conspiracy must consist of wrongs that would have been actionable against the conspirators individually. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581 (Tex. 1963). Generally, if an act by one person cannot give rise to a cause of action, the same act cannot give rise to a cause of action if done pursuant to an agreement between several persons. *Gulf &* [sic] *Atlantic Life Ins. Co. v. Hurlbut,* 696 S.W.2d 83, 102 (Tex.App.—Dallas 1985), *rev'd on other grounds,* 749 S.W.2d 762 (Tex.1987).
>
> Therefore, the jury's findings on conspiracy are relevant only if we find in Pledger's favor on one of the other tort theories pleaded, that is, interference with contract or unfair competition. Because we find that Pledger failed to establish any other substantive tort, we hold there is no independent liability for conspiracy. Point of error twenty-six is sustained.

*Schoellkopf,* 778 S.W.2d at 900 (footnote omitted).

 In this snippet, the *Schoellkopf* court reasons, understanding simply a basic postulate of the civil conspiracy cause of action: that an underlying act must be actionable in order to support a claim for civil conspiracy. In other words, a morally bad act will not suffice, or an act otherwise odious or unkind; instead the bad act must be actionable, and it is apparently this point that Defendants misapprehend in relation to the statute of limitations. Regardless of whether the one-year statute of limitations has run on an underlying defamation claim, the accused activity would give rise to a substantive cause of action although the remedy for that claim might itself be barred. One member of the Supreme Court of Texas has explained the distinction thus:

> Limitations is unlike other defenses that may be asserted.... The limitations de-

fense does not challenge the merits of the ... underlying cause of action, as do contributory negligence, interspousal immunity, governmental immunity, the fellow servant rule, the Guest Statute, or any other defenses (whether currently existing or not) that we historically have recognized as a bar. Limitations denies a right to recovery, but does not extinguish substantive rights. *See, e.g., City of Dallas v. Etheridge,* 152 Tex. 9, 14, 253 S.W.2d 640, 643 (1953) ("statutes of limitation do not affect the substantive rights of parties; they merely bar the remedy by which one party seeks to enforce his substantive rights").

*Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 359 (Tex.1992) (Gammage, J., concurring and dissenting). This procedural notion of statutes of limitations [3] is contrastable with a substantive notion commonly found in securities jurisprudence. For instance, one court has explained the substantive notion this way:

> The trial court placed the burden of proof on the defendants to show that plaintiffs had failed to comply with the statutory period of limitations under § 12(2) [of the Securities Act of 1933] and § 10(b) [of the Securities Exchange Act of 1934]. We hold that this was error. The burden of showing compliance with the § 12(2) statutory period of limitations rests on the plaintiffs. Loss states:
>
> > [I]t is the general rule in the federal courts that, when the very statute which creates the cause of action also contains a limitation period, the statute of limitations not only bars the remedy but also destroys the liability, and therefore the plaintiff must plead and prove facts showing that he is within the statute. This view has been consistently followed under the Securities Act.
>
> 3 L.Loss [Securities Regulation at 1744 (2d ed. 1961)].

*Cook v. Avien, Inc.,* 573 F.2d 685, 695 (1st Cir.1978).

Although the remedy for defamation may be destroyed if the statute has run on Plaintiff's defamation claim, the liability for that alleged defamation remains. As long as Plaintiff timely filed his conspiracy claim, the remedy for it is unscathed and the extant liability of an underlying defamation claim supports it regardless of the fate of a remedy for that underlying claim. Defendants' motion on this score must therefore be denied.

Defendants next take issue with Plaintiff's defamation claim on the issue of actual malice. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court determined that a public official suing for libel must carry the heavy burden of showing that a defendant acted with "actual malice." *Id.* at 279–80, 84 S.Ct. at 725–26. The Court later extended that holding to cover public figures as well as public officials. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). One acting with actual malice knows that a publication is false or acts with reckless disregard of whether it was false or not. *New York Times Co.,* 376 U.S. at 280, 84 S.Ct. at 726. An additional hurdle beyond having to prove actual malice is having to prove it by clear and convincing, rather than by a preponderance, of the evidence. *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066 (5th Cir. 1987). In order to force Plaintiff into this heightened standard of actual malice, Defendants must first demonstrate that Plaintiff is a public figure or official. The Court determines that it need only address the public figure issue.

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974), the Supreme Court identified two classes of public figures: general-purpose and limited-purpose, as follows:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects

---

**3.** Although one may infer the procedural nature of statutes of limitations in Texas from Justice Gammage's language quoted above, case law explicitly states that statutes of limitations are pro-

cedural in Texas. *See, e.g., Hollander v. Capon,* 853 S.W.2d 723, 727 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. *Id.* Plaintiff clearly would not qualify as a general-purpose public figure, and Defendants do not disagree. If Defendants are right about Plaintiff's status, it must be because he is a limited-purpose public figure.

The United States Court of Appeals for the Fifth Circuit has adopted the District of Columbia Circuit's three-step test for the determination of limited-purpose public figure status: (1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433–34 (5th Cir.1987) (adopting test of *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.1987) (*en banc*), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987)). The Fifth Circuit further glossed the meaning of "limited purpose" by noting that one achieves such status by thrusting oneself to the forefront of particular public controversies in order to influence the resolution of the issues involved or because one voluntarily injects oneself or is drawn into a particular public controversy. *Trotter*, 818 F.2d at 433. Additionally, the court likened such a status determination to trying to nail a jellyfish to the wall and stated that this "difficult determination cannot be made by the mechanical application of general rules." *Id.*

Plaintiff responds to Defendants' onslaught by apparently conceding much of Defendants' argument but asserting that he did not voluntarily insert himself into the controversy. Plaintiff argues, for the most part, that he was minding his own business until dragged, kicking and screaming, into a public controversy by the defendants. Regarding prong one of the test, it is clear that publica-

tions were made by some of the defendants and letters written both against and on behalf of Plaintiff. There was therefore public controversy sufficient to satisfy prong one, even if understood to be a controversy among the limited public concerned with Plaintiff's work with the kinkajous. However, that controversy is also a part of the larger, animal-rights controversy that frequently finds its way into all sorts of media from coast to coast. Thus understood, the facts of this case satisfy *Trotter's* prong one. Nor should prong two pose a large problem; Plaintiff clearly had more than a trivial or tangential stake in the controversy. Indeed, he was at its center. Likewise, prong three; Plaintiff's defamation claim arises directly out of the controversy—Defendants' publications and letters, and the public's letters, regarding Plaintiff's work with the kinkajous.

Plaintiff's contention that he did not inject himself but rather was drawn into a public controversy is unavailing. Plaintiff actively participated in the controversy by appearing on television and giving interviews to magazines. He also apparently tried to orchestrate a counter-letter-writing campaign. The Court therefore concludes that, judged under the three-prong analysis of *Trotter*, Plaintiff was a limited-purpose public figure. The Court does not agree, though, with Defendants regarding the state of the summary judgment record. The actual malice inquiry focuses on the defendants' states of mind, *Herbert v. Lando*, 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979), which may be proved by indirect or circumstantial evidence. *Id.* at 165, 99 S.Ct. at 1643. Having reviewed the summary judgment record, the Court concludes that a genuine issue of material fact remains at least regarding the issue of intent.

Defendants launch their next salvo at Plaintiff's defamation claim on the issue of privilege, claiming that their communications with governmental officials were absolutely privileged as an attempt to petition the government for a redress of grievances. Defendants' authority for this proposition states as follows:

Absolute privilege is limited to communications uttered in executive, legislative, ju-

dicial and quasi-judicial proceedings and the marital relationship. The rule is based upon the public-policy principle that every citizen should have the unqualified right to appeal to the agencies of his government for redress without the fear of being called to answer in damages for libel. *See Runge v. Franklin,* 72 Tex. 585, 10 S.W. 721 (1889).

*Moore & Assocs. v. Metropolitan Life Ins. Co.,* 604 S.W.2d 487, 489 (Tex.Civ.App.—Dallas 1980, no writ) (citations omitted). The *Runge* court considered an allegation of libel arising from statements made in a petition for an injunction filed in a court of competent jurisdiction. The court stated, "[w]e believe it is and ought to be the law that proceedings in civil courts are absolutely privileged. Citizens ought to have the unqualified right to appeal to the civil courts for redress, without the fear of being called to answer in damages for libel." *Runge,* 10 S.W. at 724. Defendants would be right, of course, if Plaintiff sued them for filing the Bexar County suit. But he does not.

Defendants' communications with governmental officials did not occur in a judicial, executive, or legislative proceeding. The case at bar is more closely analogous to the facts of *Koehler v. Dubose,* 200 S.W. 238 (Tex.Civ.App.—Dallas 1918, writ ref'd). There, the court considered allegations of libel contained in two letters, one signed and one unsigned, addressed to the state comptroller regarding the granting of a new liquor license to the plaintiff. Plaintiff operated a county-line saloon, and some of the residents of Lytle, Atascosa County were concerned that

> it is common practice for certain unscrupulous persons to buy for and deliver to minors all the liquor they want and that owing to the inherent hell in the commodity sold[,] young men whom proud mothers had hoped to proffer their state and nation as good citizens, are in a fortnight converted into drunken wretches and laid at their feet.

*Id.* at 240. The defendants attacked Plaintiff's allegations on the ground that "the two instruments were addressed by citizens on a public matter, to the comptroller of public accounts, who has the power and authority to grant, revoke, or refuse licenses to sell intoxicating liquors in Texas." *Id.* at 242. The court recognized that two classes of privilege exist, absolute and qualified, and concluded that "the communications were not made in a judicial proceeding, and that the publishers of the statements will be guilty of libel if it be shown that the accusations were made in bad faith and with malice towards appellant." *Id.* at 243. The court thus rejected the defendants' contention that absolute privilege attached, but agreed that the letters were entitled to a qualified privilege, which required the plaintiff to prove malice.

In the instant case, Defendants' letters addressed to Arizona's governor, to the Arizona official who had authority to issue and revoke Plaintiff's permits and to the Mexican official with similar authority were not part of a judicial, executive, or legislative proceeding, and after the reasoning of the *Koehler* court, are not entitled to an absolute privilege. Defendants' corollary argument is that a qualified privilege attached to their communications with governmental officials. This assertion appears to be true, but would entitle them to no more protection than has already been determined to apply per Plaintiff's status as a limited-purpose public figure who must establish malice anyway.

Defendants' next attempt arises from the *Noerr–Pennington* doctrine, after *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine stems from antitrust law and basically holds that petitioning the government to take anticompetitive action does not violate the antitrust laws. Although an antitrust doctrine, its application has been widened in a few instances to reach lawsuits against persons who petitioned governmental agencies or officials for redress of grievances. One example is *Westfield Partners, Ltd. v. Hogan,* 740 F.Supp. 523 (N.D.Ill.1990). This case was a 42 U.S.C. § 1983 suit by a land developer against homeowners who had petitioned to prevent the developer from developing a proposed roadway to acreage the

developer wanted to turn into "Tall Oaks Estates." The court held that the defendants' petitioning was absolutely privileged under the first amendment and based this privilege on the *Noerr–Pennington* doctrine. *Id.* at 525. The court noted that the defendants were sued for nothing more than exercising their right to petition their government.

This case, though, is different. Plaintiff does not sue because Defendants attempted to influence governmental decision making. Instead, Plaintiff takes issue with alleged defamation that occurred during that petitioning and in publications inducing the petitioning. The Court finds the Supreme Court's pronouncement in *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), rather than the *Noerr–Pennington* doctrine, instructive on this issue. The defendant in *McDonald* sent defamatory letters to various governmental officials, including President Reagan and Representatives Jack Kemp and Barry Goldwater, Jr., concerning the plaintiff's ethical qualifications to serve as United States Attorney, a position for which he sought appointment. Defendant argued that the Petition Clause of the First Amendment, which guarantees "the right of the people . . . to petition the Government for a redress of grievances," should provide him with absolute immunity. The Court disagreed, noting that "[u]nder state common law, damages may be recovered only if [the defendant] is shown to have acted with malice. . . ." *Id.* 472 U.S. at 485, 105 S.Ct. at 2791.[4] The Court concluded as follows: "We hold that the Petition Clause does not require the State to expand this privilege into an absolute one. The right to petition is guaranteed; the right to commit libel with impunity is not." *Id.* The Supreme Court has elsewhere suggested that the *Noerr–Pennington*

doctrine finds its basis in the Right to Petition Clause of the First Amendment. *See Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378, 111 S.Ct. 1344, 1353, 113 L.Ed.2d 382 (1991). Because Defendants support their absolute immunity defense on *Noerr–Pennington,* which itself rests on the right to petition clause, the Court must reject Defendants' contention because the Supreme Court clearly elucidates in *McDonald* that that clause poses no barrier to Plaintiff's defamation claim so long as the added safeguard of actual malice is in place.[5]

Finally, Defendants attack Plaintiff's intentional infliction of emotional distress claim. This year, the Supreme Court of Texas placed its imprimatur on the intentional infliction cause of action, which had been recognized for some time by courts of appeals. In *Twyman v. Twyman*, 855 S.W.2d 619 (Tex.1993), the court stated the following regarding that cause of action:

> While this court has never expressly recognized the tort of intentional infliction of emotional distress, we found no reversible error in the court of appeals' opinion in *Tidelands Automobile Club v. Walters*, which did so. 699 S.W.2d 939 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). There, the court of appeals adopted the elements of the tort as expressed in the RESTATEMENT (SECOND) OF TORTS § 46 (1965). The Restatement elements of intentional infliction of emotional distress are: 1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe. *Id.* According to the Restatement, liability for outrageous conduct should be found "only where the conduct has been so outrageous in character, and

---

4. This Court has concluded based on two grounds that Plaintiff must show malice: *New York Times Co. v. Sullivan* and Texas common-law qualified immunity.

5. In fact, shortly after the *McDonald* decision, one commentator recognized the fallacy of the very argument Defendants advance. *See* Robert A. Zauzner, Note, *The Misapplication of the Noerr–Pennington Doctrine in Non–Antitrust*

*Right to Petition Cases,* 36 STAN.L.REV. 1243 (1984). The Supreme Court has likewise noted that *Noerr–Pennington* is an *antitrust* doctrine. *See Columbia,* 499 U.S. at 379–80, 111 S.Ct. at 1354 (*Noerr–Pennington* "rests ultimately upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.' ")

so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* cmt. d. *Id.* at 621. The court concluded that "[t]oday, we become the forty-seventh state to adopt the tort of intentional infliction of emotional distress as set out in § 46(1) of the RESTATEMENT (SECOND) OF TORTS. *Id.* at 621–22. Having scrutinized the summary judgment record, the Court determines that Plaintiff raises a genuine issue of material fact regarding his intentional infliction claim. Consequently, Defendants' motion on this issue must be denied.

 However, Plaintiff's burden on the intentional infliction claim is also heightened by first amendment concerns. In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the Court considered an intentional infliction of emotional distress claim against a publisher whose magazine contained a bawdy parody of a liquor advertisement that featured "interviews" with celebrities talking about their "first time." The suggestive nature of one's "first time" was clear, but by the end of the interview, it became apparent that "first time" referred to a celebrity's first time to consume the advertised liquor. The Plaintiff, a nationally-known televangelist and founder of the Moral Majority, took issue with the cartoon's suggestion that his first time occurred during a drunken incestuous rendezvous with his mother in an outhouse. On consideration, the Court refused to countenance the assertion that "the intent to cause injury ... is the gravamen of the tort [of intentional infliction of emotional distress], and the State's interest in preventing emotional harm simply outweighs whatever interest a speaker may have in speech of this type." *Id.* at 53, 108 S.Ct. at 880. Instead, the Court stated as follows:

We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress ... without showing in addition that the publication contains a false statement of fact which was made with "actual malice...."

*Id.* at 56, 108 S.Ct. at 882. Plaintiff's burden here is therefore likewise increased.

 Finally, Defendants move the Court to dismiss Defendant Zephyr Carlyle, arguing that Plaintiff's only mention of him in the first amended complaint is as follows:

(a) Zephyr Carlyle, the attorney representing the plaintiff in the [Bexar County] suit is listed on the payroll of FOA [Friends of Animals, Inc.]....

Although this language does not say much, Plaintiff's broad-brush allegations of conspiracy are factually sufficient to include Defendant Carlyle when considered purely on the basis of the pleadings as one must in the 12(b)(6) context. It is therefore not the case that Plaintiff could prove no set of facts entitling him to relief on a conspiracy claim against Carlyle. In other words, there is no legal deficiency with a claim against Carlyle, and it would therefore be inappropriate to grant a 12(b)(6) motion as to him.

However, Defendants point out a factual deficiency in the evidentiary record, and this assertion, if true, is relevant to Defendants' alternative motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (When the nonmovant bears the burden of proof at trial, the movant may discharge his burden by pointing out to the court that there is an absence of evidence to support the nonmovant's case.) In response, Plaintiff does not even mention Defendant Carlyle, much less offer any evidence to raise a genuine issue of material fact as to him. The Court therefore determines that Defendants' motion for summary judgment must be granted as to Defendant Carlyle.

As set forth above, though, Defendants' motion is in all other regards denied.

**SO ORDERED.**